## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KIMBERLY-CLARK CORPORATION,
P.O. Box 619100
Dallas, TX 75261-9100,

       *Plaintiff*,

   v.

THE DISTRICT OF COLUMBIA,
c/o Office of the Attorney General
441 4th Street, NW
Washington, DC 20001,

MURIEL BOWSER, *in her official capacity as Mayor of the District of Columbia*,
1350 Pennsylvania Avenue, NW, Suite 316
Washington, DC 20004,

KARL A. RACINE, *in his official capacity as Attorney General of the District of Columbia*,
441 4th Street, NW
Washington, DC 20001,

TOMMY WELLS, *in his official capacity as Director of the Department of Energy & Environment*,
1200 First Street, NW
Washington, DC 20002, and

DISTRICT OF COLUMBIA WATER AND SEWER AUTHORITY,
5000 Overlook Avenue, SW
Washington, DC 20032,

       *Defendants*.

Case No. _____

## COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

Plaintiff Kimberly-Clark Corporation ("Kimberly-Clark") brings this Complaint against the District of Columbia ("the District" or "D.C."), Muriel Bowser in her official capacity as Mayor of the District of Columbia, Karl A. Racine in his official capacity as Attorney General of the District of Columbia, Tommy Wells in his official capacity as Director of the Department of

Energy & Environment, and the District of Columbia Water and Sewer Authority (collectively, "Defendants").

1.      Kimberly-Clark seeks injunctive and declaratory relief preventing Defendants from enforcing the Nonwoven Disposable Products Act of 2016, D.C. Law 21-220, 64 D.C. Reg. 174 (Jan. 13, 2017) ("the Act"), which became law on March 11, 2017 and becomes enforceable on January 1, 2018, *see* 64 D.C. Reg. 2879 (Mar. 24, 2017).  This Act prohibits manufacturers of nonwoven disposable products, such as moist wipes, from labeling those products as flushable (i.e., "safe to flush, safe for sewer systems, or safe for septic systems") unless they "[d]isperse[] in a short period of time after flushing in the low-force conditions of a sewer system," are not "buoyant," and are free of "material that does not readily degrade in a range of natural environments."  D.C. Law 21-220, §§ 2(1), 3.  If a nonwoven product does not satisfy these amorphous standards, the Act requires that a manufacturer "clearly and conspicuously label the [product] to communicate that [it] should not be flushed."  *Id.* § 3(b).  The Mayor and the Attorney General enforce the Act, and the Mayor can impose civil fines and penalties.  *Id.* § 4. The Department of Energy & Environment must issue rules to implement the Act's provisions, in consultation with the District of Columbia Water and Sewer Authority.  *Id.* § 5.

2.      The Act is in conflict with the Constitution of the United States, and is therefore preempted, null, and void.  It violates the Commerce Clause because it invalidly seeks to regulate the conduct of manufacturers in other states by imposing civil sanctions on conduct that is entirely lawful in states like South Carolina, where Kimberly-Clark manufactures its moist wipes labeled as flushable ("flushable wipes," "flushable moist wipes," or "FMWs").  In fact, Kimberly-Clark's conduct is indisputably lawful in every other jurisdiction in the United States.  Yet the District's theory appears to be that Kimberly-Clark's out-of-state manufacturing activities have local effects,

and are subject to D.C. governance as a result.  But the Act does *not* directly regulate any local activity.  Indeed, it remains lawful under the Act for retailers to buy wipes labeled as flushable and to resell those products to consumers in D.C., regardless of whether that labeling is deemed consistent with the Act.  Likewise, it remains lawful for D.C. consumers to purchase and use those very same products, no matter how they are labeled.  But it is the manufacturers who exclusively bear liability for this activity, as the only thing regulated by the Act is non-local manufacturing and labeling activity.  Thus, whether construed as a *per se* invalid regulation of out-of-state commercial conduct or as a regulation that inordinately burdens interstate commerce, the Act violates the Commerce Clause.  The Act also violates the First Amendment because it unconstitutionally restrains commercial speech and compels speech by private actors—it requires Kimberly-Clark and other manufacturers to take wipes that they believe are flushable (and market as such) and instead "clearly and conspicuously label" them as products that "should not be flushed."  And it violates the Fifth Amendment in two respects.  It first imposes civil sanctions under impermissibly vague standards, and second, it invalidly seeks to hold manufacturers vicariously liable for the actions of others, namely the unaffiliated businesses that buy Kimberly-Clark's flushable wipes elsewhere in the United States and then—lawfully—choose to resell them to local consumers.  Unless enjoined, the Act will violate Kimberly-Clark's constitutional rights and inflict irreparable harm on Kimberly-Clark's business.

3.      Perversely, unless enjoined, the Act is almost certain to harm the District itself.  It is well-known and documented, including by the District's former sewer manager, that residents regularly flush wipes that are *not* designed to be safely flushed, and thus are not labeled as flushable.  And it is incontrovertible, as evidenced by the District Council record and by witnesses who testified in support of the Act, that those *non*-flushable wipes are virtually indestructible and

pose far greater harms to the District's sewers than Kimberly-Clark's flushable wipes are capable of causing.  By precluding manufacturers from labeling their products in a way that helps consumers easily distinguish between products that are designed to be safely flushed and products that are not designed for safe flushing, the Act would only increase consumer confusion and, accordingly, exacerbate the harm to the District's systems.

## PARTIES

4.      Kimberly-Clark Corporation is a Delaware corporation with its principal executive offices in the Dallas, Texas metropolitan area and its relevant manufacturing facilities in Beech Island, South Carolina.

5.      Kimberly-Clark is a 145-year-old global company focused on creating consumer products for personal care and professional hygiene.  It is principally engaged in the manufacturing and marketing of a wide range of products frequently made from paper or wood pulp, using advanced technologies in fibers, nonwovens, and absorbency.  These products include disposable diapers, feminine and incontinence care products, facial tissue, paper towels, and as most relevant here, sanitary wipes and bathroom tissue.  Kimberly-Clark's brands include Cottonelle®, Scott®, Huggies®, Kleenex®, Depend®, Poise®, Pull-Ups®, Goodnites® and Kotex®.  Kimberly-Clark manufactures and sells flushable wipes in the United States under its Cottonelle®, Scott Naturals®, and Pull-Ups® brands.

6.      Kimberly-Clark sells its flushable wipes to business entities under a variety of contractual arrangements, including some requiring Kimberly-Clark's continued performance after the Act's enforcement date.

7.      Because of the nature of wholesale and retail sales and the long shelf life of Kimberly-Clark's flushable wipes, a long period of time may pass between when Kimberly-Clark manufactures or first sells its flushable wipes and when those wipes may reach the retail market.

For example, Kimberly-Clark may sell flushable wipes to a wholesaler who in turn sells the flushable wipes to a retailer.  If those flushable wipes are not sold at retail, whether because of demand or because the retailer ceases doing business, the same flushable wipes may reenter the secondary distribution market.  The distributor may then either retail them itself at a discount from normal retail prices or sell them to a closeout retailer that sells them to consumers in the District at a discount from normal retail prices.  Many such discount or closeout retailers operate in the District, including Big Lots, Dollar Tree, and Family Dollar.  Kimberly-Clark cannot control these unaffiliated retailers or the choices they make about what products to advertise and carry.  Nor does Kimberly-Clark have any control over whether online retailers choose to sell flushable wipes to consumers in the District.

8.      The District of Columbia is a municipal corporation established by Congress.  16 Stat. 419.

9.      Muriel Bowser is the Mayor of the District of Columbia and is named in her official capacity.  Under the Act, "[t]he Mayor may impose civil fines and penalties as sanctions for violations of the provisions of [the Act] or any rules issues pursuant to [it]."  D.C. Law 21-220, § 4(a).  Furthermore, the Mayor is authorized to receive process on behalf of the District of Columbia.  D.C. Code § 2-401.

10.      Mayor Bowser maintains an office at 1350 Pennsylvania Avenue, NW, Suite 316, Washington, DC 20004.

11.      Karl A. Racine is the Attorney General of the District of Columbia and is named in his official capacity.  Under the Act, "the Attorney General for the District of Columbia may seek injunctive relief or other appropriate remedy in any court of competent jurisdiction to enforce compliance with this act."  D.C. Law 21-220, § 4(b).

12.    Attorney General Racine maintains an office at 441 4th Street, NW, Washington, DC 20001.

13.    Tommy Wells is the Director of the District of Columbia's Department of Energy & Environment ("DOEE"), and is named in his official capacity.  Under the Act, DOEE "shall issue rules to implement the provisions of this act."  D.C. Law 21-220, § 5; *see id.*, *preamble* (stating that DOEE is "authoriz[ed] . . . to issue rules to implement the provisions of th[e] act").  Mr. Wells submitted written testimony in connection with the Council's consideration of the legislation in which he purported to "present the view of the Executive on the[] bill[]."

14.    DOEE maintains its office at 1200 First Street, NW, Washington, DC 20002.

15.    The District of Columbia Water and Sewer Authority ("DC Water") is an independent authority of the District of Columbia that provides water and sewer services to the region.  D.C. Code § 34-2202.02(a).  Upon information and belief, approximately one-third of the wastewater that DC Water treats flows in from Maryland and Virginia.

16.    DC Water is governed by a Board of Directors, which consists of 11 principal and 11 alternate members.  D.C. Code § 34-2202.04(a).  The Board is composed of six District of Columbia representatives, as well as representatives recommended by Montgomery and Prince George Counties, Maryland, and Fairfax County, Virginia.  D.C. Code § 34-2202.04(a).  The Mayor of the District of Columbia appoints, and the District of Columbia Council confirms, all six District Board members and alternates.  D.C. Code § 34-2202.04(a)(2).  The Mayor also appoints the five principal and alternate members who represent the surrounding jurisdictions.  D.C. Code § 34-2202.04(a)(3).  DC Water has a "General Manager" who serves as Chief Executive Officer, D.C. Code § 34-2202.06(a), as well as other officers.  The Act's aforementioned provisions requiring DOEE to issue rules to implement the Act further require

that DOEE's "rules to interpret section 2(2) shall be made in consultation with the District of Columbia Water and Sewer Authority."  D.C. Law 21-220, § 5.  DC Water's CEO and General Manager, George Hawkins, also submitted written testimony in support of the legislation, calling it "critically important to DC Water wastewater operations."

17.     DC Water is located at 5000 Overlook Avenue, SW, Washington, DC 20032.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

19.     Kimberly-Clark has standing to bring this action because the Act purports to regulate its manufacturing and speech activities, and to subject it to civil monetary fines and penalties, among other potential sanctions, for non-compliance with the Act.

20.     This Court has authority to grant the requested relief under, *inter alia*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and 42 U.S.C. § 1983, because the Act infringes upon Kimberly-Clark's constitutional rights.

21.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because at least one defendant in this action resides in this judicial district, and because a substantial part of the events giving rise to Kimberly-Clark's claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

### Legislative History of the Nonwoven Disposable Products Act of 2016

22.     On July 12, 2016, District of Columbia Councilmember Mary M. Cheh introduced the Nonwoven Disposable Products Act of 2016, B21-0833.  According to its proponents, the Act aims to address "significant and costly clogs" in the District's sewer system that are allegedly caused by certain wipes that "bind with fats, oil, and grease" and block the flow of waste water.

D.C. Council, Committee Report for Bill 21-0833, at 2 (Nov. 7, 2016).[1]   According to the Committee on Transportation and the Environment, some of these wipes are marketed as "flushable," but do not in fact break down sufficiently.  The Act responds by prohibiting their manufacturers from labeling disposable wipes as "flushable" unless they satisfy the District's definition of the word.  Moreover, the Act requires manufacturers whose products do not meet this "definition" to "clearly and conspicuously label" their wipes as "not . . . flush[able]."

23.    The Committee on Transportation and the Environment held a public hearing regarding the bill on October 24, 2016.  Among those testifying was Dave Rousse, President of INDA, the nonwovens industry association.  He testified that only 7% of wipes produced are marketed as flushable and that significant technology has been developed and used to make these flushable wipes break down in sewers.  There is substantial evidence that this technology works. Studies show that, although wipes labeled "flushable" constitute the majority of wipes flushed into sewers, they constitute as little as 2.5% of wipes collected from sewers, and an even smaller percentage of all debris collected from sewers (with non-flushable wipes, feminine hygiene products and paper towels each being far more prevalent).  These studies classify a piece of debris as a wipe based on samples as small as a one-inch piece of material—i.e., a wipe that has significantly broken down into smaller pieces (Kimberly-Clark's Cottonelle® flushable wipes, for example, measure 7.25 x 5 inches)—from which a type of wipe can be identified.  As Rousse testified, the debris found in sewers and municipal wastewater systems largely stems from people flushing items that were never designed to be flushed, such as paper towels, feminine hygiene

---

[1] Notwithstanding the Committee Report's claim that these clogs—whatever is actually their cause—are "significant and costly," the Report goes on to state that "DC Water estimates that it pays approximately $50,000 each year to combat issues caused by wipes." *Id.*  DC Water has an operating budget of $535.8 million for Fiscal Year 2017, making this supposed wipes-related expenditure 0.0000933% of the budget.

products, and non-flushable baby or cleaning wipes.  Based on studies conducted in Maine, California, and New York, Mr. Rousse concluded that flushable wipes have not caused increased sewer debris.

24.     At the Committee Hearing, Mr. Rousse also testified that, even if flushable wipes were an issue, the Act's labeling requirements would be counterproductive.  He stated that "[t]he flushable wipes category has experienced immense growth due to consumers' desire for enhanced cleaning options in the toileting process," and that if fewer flushable wipe options were available because wipes that do break down nonetheless cannot pass the District's standard, consumers will use and flush baby wipes, paper towels, or other substitute products that do not dissolve in the sewer.  As detailed below, Mr. Rousse's statement is consistent with consumer research Kimberly-Clark conducted both before developing its flushable wipes and after introducing those wipes to the market.  It also is consistent with statements by municipal wastewater personnel employed by the District and associated with other municipalities or entities nationwide.

25.     Nonetheless, the Council passed an amended version of this bill on December 23, 2016, after provisions restricting the political speech of manufacturers were removed, and Mayor Bowser signed the bill on January 6, 2017.

26.     The Council transmitted the signed Act to Congress on January 25, 2017.  The Act became effective by operation of law on March 24, 2017 because Congress took no action during the period of congressional review provided in section 602(c)(1) of the District of Columbia Home Rule Act.  D.C. Law 21-220, § 8.

**Nonwoven Disposable Products Act of 2016**

27.     The Act purports "[t]o prohibit a manufacturer of nonwoven disposable products for sale in the District" from labeling such products "as safe to flush, safe for sewer systems, or

safe for septic systems, unless the nonwoven disposable product is flushable" within the meaning of section 2(1) of the Act, and "to require a manufacturer of a nonwoven disposable product for sale in District that is not flushable to label the nonwoven disposable product to communicate that it should not be flushed."  D.C. Law 21-220, *preamble*.  Importantly, the Act does not regulate District-based entities or local activities.  Indeed, an earlier version of the bill made clear its intent to *exclude* D.C. activities from the reach of the D.C. law by stating: "Nothing in this act shall apply to: . . . A wholesaler or retailer that distributes or sells, but does not package or label, a nonwoven product that is advertised, packaged, or labeled as flushable, sewer safe, and septic safe." B21-0833 Introduced by Councilmember Cheh at Legislative Meeting § 4(d)(2) (July 12, 2016) (emphasis added), available at http://lims.dccouncil.us/Download/36244/B21-0833Introduction.pdf.  The enacted law likewise applies exclusively to "a manufacturer," never mind that there are no manufacturers of flushable wipes in the District.  It also does not regulate in any way the activities of downstream distributors or sellers of nonwoven disposable products.

28.     Further, the Act's focus on labeling (as opposed to the local sale or use of the wipes) is intentional.  The Committee concluded that the current labeling of wipes for sale is not uniform and "[s]ome packages include . . . text in small font, and others include a logo under the flap where users are not likely to see it."

29.     The Act attempts to impose uniformity on the out-of-state labeling practices of the industry.  It defines "[f]lushable" to mean "a nonwoven disposable product that:  (A) [d]isperses in a short period of time after flushing in the low-force conditions of a sewer system; (B) [i]s not buoyant; and (C) [d]oes not contain plastic or any other material that does not readily degrade in a range of natural environments."  D.C. Law 21-220, § 2(1).

30.     The Act states that "label" "means to represent by statement, word, picture, design, or emblem on the packaging of a nonwoven disposable product."  D.C. Law 21-220, § 2(2).

31.     Under the Act, "nonwoven disposable product" "means a product constructed from nonwoven sheets, including moist toilet tissue or cloth, that is designed, marketed, or commonly used for personal hygiene purposes."  D.C. Law 21-220, § 2(3).[2]

32.     The Act then provides that "[a]fter January 1, 2018, a manufacturer of a nonwoven disposable product for sale in the District shall not label the nonwoven disposable product as safe to flush, safe for sewer systems, or safe for septic systems, unless the nonwoven disposable product is flushable."  D.C. Law 21-220, § 3(a).  It also compels affirmative speech, purporting to direct that "[a]fter January 1, 2018, a manufacturer of a nonwoven disposable product for sale in the District that is not flushable must clearly and conspicuously label the nonwoven disposable product to communicate that the nonwoven disposable product should not be flushed."  *Id.* § 3(b).

33.     While the text of the Act suggests that certain wipes labeled as flushable could satisfy this standard, the legislative record shows that the Council believed the current guidelines for flushability are deficient and intended to prohibit *every* wipe currently on the market in the United States from being labeled as flushable.  The witnesses who testified in support of the Act

---

[2] Although the legislative record demonstrates that the Act was directed at manufacturers of nonwoven flushable wipes, the text of the Act indicates a far broader reach.  Its vague definition of "nonwoven disposable product" appears to encompass all manner of nonwoven products that are routinely used for personal hygiene, including facial tissue, paper towels, toilet paper, and wound dressings, among other items.  Kimberly-Clark has repeatedly contacted the Mayor, who is charged with enforcement of the Act (*infra* ¶ 34), to request a ruling that its flushable wipes are compliant with the Act.  The Mayor has refused to so rule or to offer any assurance that Kimberly-Clark's products are in compliance.  Moreover, based on its participation in the rulemaking to date, Kimberly-Clark understands that the relevant agencies take the position that neither any flushable wipe currently on the market is considered flushable under the Act nor are various brands of toilet paper.

made plain that no flushable wipe satisfies the standard for flushability adopted by the Council. For instance, Dr. Cynthia Finley of the National Association of Clean Water Agencies ("NACWA") stated in support of the Act that "wipes that are labeled 'flushable' do not break apart quickly enough in sewer systems."  Dr. Finley added: "field test[s] [conducted by the City of Vancouver, Washington] demonstrate that flushable wipes currently on the market in the U.S., with one possible exception, cannot be considered safe to flush since they travel through real sewers intact, with no dispersion."[3]

34.    To enforce § 3, the Act authorizes the Mayor to "impose civil fines and penalties as sanctions" and authorizes the Attorney General to "seek injunctive relief or other appropriate remedy in any court of competent jurisdiction to enforce compliance with th[e] [A]ct." D.C. Law 21-220, § 4.  The Act does not specify, however, which entity will take the predicate step of analyzing whether a particular wipe, as labeled, complies with D.C.'s unspecified rules.

35.    Finally, the Act directs the Department of Energy and Environment to promulgate rules, in "consultation with the District of Columbia Water and Sewer Authority," "to implement the provisions of th[e] [A]ct."  D.C. Law 21-220, § 5.  The Act does not set any deadline for the promulgation of such rules.

36.    DOEE and DC Water have not yet proposed or promulgated any such rules.

---

[3] Although Dr. Finley's testimony does not always accurately describe the findings of the City of Vancouver tests upon which she relied, those studies make clear that the wipe Dr. Finley described as the "one possible exception" is manufactured by Kimberly-Clark.  The City of Vancouver's most recent field test (dated August 10, 2016), for instance, stated that samples collected of Kimberly-Clark's Cottonelle® flushable wipe "showed significant breakdown" in that city's sewer system.  The author concluded that because the Cottonelle® wipe samples recovered "showed significant breakdown," it "truly performed well."  By contrast, in the same field test report, the City of Vancouver noted its experience with a sample of *toilet paper* that "display[ed] very little ability to break down in a sewer system after 30 minutes."

**Kimberly-Clark's Flushable Wipes And Their Manufacturing And Sale**

37.     Kimberly-Clark does not manufacture any of its products, let alone any of its flushable wipes, in the District.  Based upon Kimberly-Clark's knowledge of the nonwoven industry, no national entity manufactures wipes labeled as flushable or other nonwoven disposable products in the District.

38.     Kimberly-Clark does not sell any of its flushable wipes directly to consumers in the District or elsewhere.  Kimberly-Clark instead sells its products to unaffiliated business entities, including retailers and wholesalers.  Some of those entities, upon information and belief, resell those products through one or more levels of transactions to consumers in the District.

39.     With respect to its flushable wipes that are the subject of suit, Kimberly-Clark has invested an extraordinary amount of time and money to create a state-of-the-art product whose performance for consumer users and in municipal wastewater systems has continually improved over time.

40.     By way of background, Kimberly-Clark began developing flushable moist toilet tissue (a predecessor to today's flushable wipes), which it first commercialized in 2001, in response to consumer usage patterns.  Kimberly-Clark has long conducted consumer surveys and focus groups to understand how consumers of its products use them and what they desire.  Through such study, Kimberly-Clark learned that its consumers of traditional dry toilet tissue were frequently using moist *non*-flushable baby wipes during adult toileting.  Those consumers reported that they used baby wipes for that purpose because they provided enhanced cleaning benefits.  Kimberly-Clark further learned that many such consumers flushed the baby wipes down the toilet after use.  Baby wipes, unlike toilet paper, are not designed to breakdown or weaken in home plumbing or in municipal wastewater systems.  On the contrary, baby wipes are designed to have

what is known as "permanent wet strength"; that is, they are designed to remain strong when used by caregivers to wipe their babies and to remain as strong as when manufactured even when exposed to water. Baby wipes are heavily comprised of polypropylene or other plastic fibers, which are combined with wood pulp fibers, to fulfill these goals. As individuals in the wastewater community have succinctly stated, "baby wipes are indestructible squares of plastic."

41.     Because of how *baby* wipes are constructed and how they perform as a result, Kimberly-Clark was (and remains) aware that *baby* wipes posed (and still pose) a significant risk of clogging consumers' home plumbing and causing problems for municipalities' wastewater systems. While clogging is a background risk of flushing anything down the toilet, including toilet paper, a heightened risk of clogging arises when a user flushes materials that, like baby wipes, not only remain strong when exposed to water and agitation but are capable of stretching.

42.     In light of Kimberly-Clark's knowledge of this consumer behavior and its potential repercussions, Kimberly-Clark set out to develop a moist wipe that was, in fact, flushable. That is, Kimberly-Clark sought to develop a flushable moist wipe that would pose little, if any, additional risk of plumbing clogs when flushed and that could be safely processed by municipalities' wastewater systems.

43.     Constructing a flushable moist wipe fit for its intended use (wiping after toileting) but that will weaken after flushing presents an engineering challenge. When removed from its package, the wipe must stay strong while wet to allow the consumer to wipe himself or herself without tearing or puncture, but also soft enough that it is comfortable for the consumer. The wipe, moreover, must be constructed to weaken and/or disperse (i.e., break apart) after flushing so as not to cause unreasonable risks to consumers' plumbing or wastewater facilities.

44. Flushable wipe manufacturers have approached that engineering challenge in a variety of ways. Kimberly-Clark has spent millions of dollars and over two decades of study on its approach, and has registered over 30 patents and counting related to its flushable wipes.

45. Kimberly-Clark's flushable wipes are characterized by a unique and patented use of chemistry that works to weaken the wipes after they have been flushed. Like toilet paper, but unlike baby wipes, the fibers in Kimberly-Clark's flushable wipes are comprised of only wood pulp—not polypropylene or other plastics or synthetic fibers. And in contrast to synthetic fibers, wood pulp is readily capable of being digested through the anaerobic/aerobic processes that characterize many wastewater treatment systems. Kimberly-Clark's manufacturing process uses a cationic binder chemistry to bind the fibers together (using ionic bonds) in the flushable wipes so that they remain strong when wet in the package and when a consumer wipes him or herself with them. Yet, the ionic bonds that Kimberly-Clark employs have a water-based trigger. This causes the wipes to lose strength once placed in water, such as they are when disposed of in the toilet.

46. Specifically, Kimberly-Clark adds sodium chloride to the wetting solution that stabilizes the binder, which provides wet strength in the package and during usage. When a Kimberly-Clark flushable wipe comes into contact with water, the sodium chloride (i.e., salt) which protects the binder is diluted and the water attacks the binder; the binder, in turn, rehydrates, softens and dissolves; and the flushable wipe loses strength as a result.

47. Kimberly-Clark's flushable wipes lose strength very quickly once introduced into water. As they lose strength, they become increasingly likely to break into pieces as they sit or move through home plumbing and then through municipal sewer systems and wastewater treatment. Baby wipes and other permanent wet strength wipes containing polypropylene, by

contrast, do not lose any strength in water.  A graphical illustration of how Kimberly-Clark's flushable wipes lose their strength while just sitting in water, as compared to how Kimberly-Clark's non-flushable baby wipes do not, is shown below[4]:



**Regulation of Flushable Wipes and Study of Their Performance**

48.     As more manufacturers began introducing wipes labeled as flushable to the market in the mid-2000s, industry guidelines were promulgated to help assess whether manufacturers' products should be flushed down toilets.

---

[4] As noted above, Kimberly-Clark has repeatedly sought to improve the performance of its flushable wipes over time on multiple metrics relevant to their flushability, and thus the graphic shows how different iterations of Kimberly-Clark's flushable wipes perform with respect to strength loss.

49.     In 2004, the International Nonwovens and Disposables Association (INDA), a primarily U.S.-based non-profit association that is comprised of manufacturers in the nonwoven products industry, began working with the European Disposables and Nonwovens Association (EDANA), the Belgium-based non-profit association for the European nonwoven products industry, to develop guidelines for assessing whether a product was flushable and to govern the labeling of such products.  INDA and EDANA worked with industry consultants and wastewater agencies in the United States and Europe to develop flushability standards.  INDA was founded in 1968, and EDANA in 1971, and have long issued standards and guidelines governing a range of other topics relevant to the nonwovens industry.

50.     INDA/EDANA issued the first set of flushability guidelines in June 2008, *Guidance Document for Assessing the Flushability of Nonwoven Consumer Products*.  Those peer-reviewed guidelines measured product performance through a series of up to 23 tiered tests designed to assess compatibility of products in toilets, home plumbing, sewers, and municipal wastewater treatment facilities through to resultant sludge.

51.     INDA/EDANA issued a second edition of the *Guidance Document for Assessing the Flushability of Nonwoven Consumer Products* in July 2009.  Among other things, in response to concerns from wastewater authorities, this edition introduced a municipal pump test that Dutch authorities had developed to assess and prevent clogs of sewer pumps.

52.     In the interim, in March 2009, INDA/EDANA published the *Manufacturers' Code of Practice on Communicating Disposal Pathways for Personal Hygiene Wet Wipes*.  This document provided that manufacturers should not only follow the aforementioned guidelines before marketing their products as flushable, but also advised manufacturers to label non-flushable products with a distinctive "Do Not Flush" symbol, as shown below:



53.     INDA/EDANA issued a third edition of the *Guidance Document for Assessing the Flushability of Nonwoven Consumer Products* in April 2013.  This edition simplified the tiered testing scheme down to just seven key tests relevant to consumers and/or municipalities, all of which must be passed for a wipe to be labeled as flushable.  This simpler approach addressed key wastewater concerns regarding prior editions and introduced specific tests for disintegration and performance in municipal pumps in all geographies.  Among other things, the edition also eliminated conditional claims of flushability, resulted in relabeling of flushable products as "Do Not Flush" and changes to basesheets from which wipes are manufactured, and drove future technology innovation.

54.     Kimberly-Clark's flushable wipes have passed the INDA/EDANA guidelines at all times, and therefore have been labeled as flushable.  Additionally, Kimberly-Clark has regularly assessed the performance of its flushable wipes on metrics that go beyond those in the INDA/EDANA guidelines, such as through the strength loss testing noted above, and by studying their behavior in laboratory and real world conditions, such as toilets, drainlines, in sewage pumps, and in septic tanks.  This testing likewise substantiates Kimberly-Clark's representations that its flushable moist wipes are, in fact, flushable.

55.     By contrast with Kimberly-Clark's flushable wipes and flushable wipes manufactured by other companies, baby wipes and other moist wipes (such as household surface cleaning wipes) not designed to be flushed would not pass the INDA/EDANA guidelines.  The

INDA/EDANA guidelines themselves expressly recognize that baby wipes and other non-flushable wipes are not capable of passing the battery of tests required to label such wipes as flushable.

56.     After the INDA/EDANA third edition guidelines were published, the nonwovens industry and the wastewater community continued to work together on flushability issues.  For example, in September 2013, the Water Environment Federation (WEF), the National Association of Clean Water Agencies (NACWA), the American Public Works Association (APWA), and INDA jointly announced an agreement to work together to reduce the burden of *nonflushable* disposable products in the wastewater system.  The organizations jointly announced: "These products have been linked to expensive clogging issues for utilities and can potentially lead to costly sewer back-ups in communities and households across the country. The associations believe that rigorous product assessment before making a flushable claim, along with improved product labeling, would significantly reduce the amount of non-flushable items in the sewer system."

57.     Moreover, upon promulgation of the third edition INDA/EDANA guidelines, the Manager of WEF's Water Science & Engineering Center, Christine Radke, announced that "INDA's new Guidelines demonstrate continued progress for determining flushability." Similarly, NACWA Director of Regulatory Affairs, Cynthia Finley, stated: "The problems in the sewer system are caused by the flushing of products that don't properly break apart in the sewer system—products such as baby wipes, personal care wipes, paper towels, and feminine care products.  These products are sometimes disposed of in toilets because of how and where they are used, causing significant economic burdens on local wastewater treatment systems."  And the Director of Sustainability of APWA, Julia Anastasio said: "We welcome the Code of Practice

and use of the Do Not Flush logo for the non-flushable products that are causing problems for utilities. Prominent use of the Do Not Flush logo on package labels represents a viable path forward for educating consumers and reducing the amount on non-flushable items in the wastewater system."

58.     Upon information and belief, the District of Columbia and/or its government agencies, including DC Water, is a member of NACWA, WEF, and the APWA.

59.     Consistent with WEF's, NACWA's, and APWA's statements about the scourge of *non*-flushable wipes, such as baby wipes and household cleaning wipes, being introduced into municipal wastewater systems, the nonwovens industry and the wastewater community have long worked together to study the composition of materials found in municipal wastewater systems.

60.     For example, a study in 2010 by a graduate student of University of California, Berkeley under initial supervision by nonwoven industry personnel, including a Kimberly-Clark employee and representatives of California municipalities, collected and sorted materials from the inlet bar screens and pump at Moraga, California. It found that flushable wipes—from all manufacturers—combined comprised between zero and 8% of the materials recovered in multiple study arms. By contrast, the study found that paper hand towels comprised between 45%-61%, feminine hygiene products between 5%-10%, non-flushable personal hygiene wipes between 9%-20%, and non-flushable household surface cleaning wipes between 8%-19% of the materials recovered. Studies jointly conducted by wastewater and nonwoven industry personnel on municipalities in Portland, Maine in 2011 and 2012 reached similar findings.

61.     Last year, New York City commissioned a similar study regarding the composition of its trash in the wastewater system. Wastewater personnel conducted that study

without any coordination with or participation from the nonwovens industry.  Consistent with Kimberly-Clark's work to improve the performance of its flushable wipes over time and its understanding that other flushable wipe manufacturers have done so, the New York Study found that only 1.2%–1.88% of material found in the sewer system were flushable wipes of any brand. By contrast, paper towels constituted between 18.6-29.88%, non-flushable baby wipes between 26.35%-29.1%, trash between 23.53%-30.0%, and feminine hygiene products between 4.2%-6.12% of all materials recovered.  Four other categories of non-flushable wipes (feminine wipes, surface cleaning wipes, facial wipes, and uncategorized non-flushable wipes) each significantly surpassed the percentage of flushable wipes recovered.  Unlike the earlier collection studies conducted, New York City identified the brands of the various materials recovered.  Not a single Kimberly-Clark flushable wipe was found.

62.     Upon information and belief, the District of Columbia has never conducted a collection study to determine whether flushable wipes are found in its wastewater system and, if so, to what degree compared with other non-flushable materials.

63.     Years before the District introduced the now-enacted legislation, federal regulators began studying, *inter alia*, the performance of flushable wipes and their effect, if any, on municipalities' wastewater systems.  In June 2013, the Federal Trade Commission ("FTC") sent Kimberly-Clark a letter requesting Kimberly-Clark's voluntary cooperation in connection with an FTC investigation to assess the safety and appropriateness of disposing of Kimberly-Clark's flushable wipes via the toilet.  In July 2013, Kimberly-Clark timely responded with information and documents substantiating Kimberly-Clark's representations that its flushable moist wipes are, in fact, flushable.  Between August 2013 and February 2014, Kimberly-Clark provided several supplements to its response.

64.    Kimberly-Clark's 2013-2014 submissions showed that its flushable wipes are indeed flushable, dispersible, and sewer and septic safe using a variety of test results and other information.  Among other things, Kimberly-Clark:

a.   explained its patented triggerable binder technology discussed above, which allows its flushable wipes to lose strength and break up in water;

b.   showed that its flushable wipes met and exceeded all criteria in the INDA/EDANA guidelines;

c.   showed how its flushable wipes experience a significant loss of strength while sitting in water; and

d.   showed how its flushable wipes break-up into small pieces and fibers when exposed to the municipal wastewater system.

65.    Additionally, Kimberly-Clark's FTC submissions detailed that its flushable wipes had repeatedly been praised by professionals in the wastewater community, and provided information demonstrating that wastewater systems are experiencing significant problems because consumers persist in flushing products that are not designed and were never intended to be flushed, including paper towels, baby wipes, household surface cleaning wipes, and feminine hygiene products.  Kimberly-Clark explained that, consistent with the INDA/EDANA code of practice noted above, Kimberly-Clark was leading the industry in the implementation of the "Do Not Flush" logo on its non-flushable disposable products, and that it also was engaged in its own consumer education campaign.

66.    Kimberly-Clark is aware that the FTC was investigating other flushable wipe manufacturers regarding the substantiation for their products' flushable claims at around the same time as the FTC requested Kimberly-Clark's cooperation.

67.     In May 2015, the FTC made public a complaint and proposed consent order that it

reached with another manufacturer of wipes labeled as flushable, Nice-Pak Products, Inc.

("Nice-Pak").  Nice-Pak manufactured and manufactures private label flushable wipes, including

those sold by Costco Wholesale Corporation under its Kirkland Signature Moist Flushable Wipes

brand, as well as by CVS, Target, and BJ's.  The FTC's complaint against Nice-Pak alleged that,

in violation of the FTC Act, Nice-Pak made unsubstantiated performance claims because the

Nice-Pak flushable-labeled products at issue in the complaint "do not break down in water in a

reasonably short amount of time," and "[a]s a result . . . can clog household public systems,

household septic systems, public sewer systems, and sewage treatment plant systems after being

flushed."

68.     In the proposed consent order, Nice-Pak agreed to cease making representations

of flushability unless it could show that "any tests, analyses, research studies, or other evidence

purporting to substantiate" representations of flushability "demonstrate that the Covered Product

disperses in a sufficiently short amount of time after flushing to avoid clogging, or other

operational problems in, household and municipal sewage lines, septic systems, and other

standard wastewater equipment; and . . . substantially replicate the physical conditions of the

environment in which the Covered Product is claimed, directly or indirectly, expressly or by

implication, to be properly disposed of; or, if no specific environment is claimed, then in all

environments in which the product will likely be disposed of."

69.     After notice and comment, the FTC entered the consent order on October 30,

2015, *In the Matter of Nice-Pak Products, Inc.*, Docket No. C-4556, File No. 132-3272, 2015

WL 7009345 (F.T.C. Oct. 30, 2015).  The order left the above-quoted requirement for

substantiating Nice-Pak's representations of flushability unchanged.  *Id.* at *3-4.  After the FTC

began investigating Nice-Pak, Nice-Pak adopted a new formulation for its flushable wipes, which has different performance characteristics than the technology that gave rise to the FTC's complaint and consent order concerning Nice-Pak's former formulation of its wipes labeled as flushable.  Nice-Pak labels the wipes manufactured using its new technology as flushable.

70.     Having received comments from municipalities—including from Nicole Kaiser on behalf of the Metropolitan Washington Utilities and Stakeholders, Washington, District of Columbia—and wastewater groups suggesting that "the Commission should notify and take action against other manufacturers that make deceptive claims about similar products," the FTC responded.  The Commission said: "We believe that the final order will put manufacturers on notice of the quality of substantiation a manufacturer should possess and rely upon before representing that a wipe is 'flushable,' and we will continue to evaluate such representations on a case-by-case basis."  *Id.* at *20.  Moreover, in response to comments submitted by Dr. Finley on behalf of NACWA, the FTC recognized that NACWA expressed its "view that the order's substantiation requirement is appropriate.  The order requires tests that substantiate that a wipe will disperse in a 'sufficiently short amount of time' after flushing to prevent clogging and/or damage to household plumbing, sewage lines, septic systems, and other standard wastewater treatment equipment.  The test must also replicate the physical conditions of the environment where the wipe will be disposed.  Moreover, those tests must be 'based on the expertise of professionals in the relevant area.'"  *Id.* at *30.

71.     In June 2015, between when the FTC made public its Nice-Pak complaint and proposed consent order and the entry of the consent order, Kimberly-Clark made another supplemental submission to the FTC of information and documentation substantiating its flushability representations.

72.     Consistent with the FTC's statement in the Nice-Pak consent order that it would be evaluating manufacturers' representations of flushability on a case-by-case basis, on or about November 13, 2015, the FTC staff contacted Kimberly-Clark to request a submission addressing whether Kimberly-Clark's flushable wipes satisfied the requirements for flushability set forth in the FTC's Nice-Pak consent order.

73.     In February 2016, Kimberly-Clark submitted a white paper to the FTC substantiating the flushability of its wipes using a variety of tests, including tests conducted in real world settings and, more specifically, conducted in a wastewater conveyance system in Wisconsin.  Kimberly-Clark demonstrated that its flushable wipes are, in fact, flushable under the standards set forth in the Nice-Pak consent order.  The FTC did not request any further submissions from Kimberly-Clark.

74.     Instead, in a letter dated June 30, 2016, the FTC informed Kimberly-Clark that it had closed its inquiry into Kimberly-Clark's flushable wipes.

75.     Thereafter, at least one manufacturer has announced that its investigation by the FTC remains ongoing.  No other manufacturer has announced that the FTC has closed an investigation into its flushable wipes.

76.     Despite having commented in support of the FTC's Nice-Pak consent order, including NACWA's above-quoted express endorsement of its substantiation standard, neither the District nor NACWA mentioned the FTC standards in the legislative record.  Instead, the District of Columbia Council's Committee Report—issued months after the FTC proposed its standards in the consent decree and weeks after the FTC finalized the consent order— misleadingly suggested, "[t]he term 'flushable' is not defined by a government entity, leaving the nonwoven disposable products industry to self-define the term when they label their products."

Similarly, the Committee Report stated that George Hawkins, the CEO and General Manager for DC Water, "emphasized that the term 'flushable' is self-defined by the industry that sells the product, and therefore not a reliable indicator of the product's performance in a sewer system." Having ignored the FTC's actions altogether, neither Dr. Finley nor Mr. Hawkins explained why they thought a distinct local ordinance was necessary or appropriate in light of the nationwide character of the industry and the FTC's active role in policing manufacturers' claims of flushability.

**Regulating Flushable Wipes As If They Were Non-Flushable Wipes Will Have Adverse Consequences For Kimberly-Clark, Commerce, And The District**

77.     From collection studies, studies of consumer behavior, and the above-quoted statements from individuals in the wastewater community, it is apparent that consumers continue to flush wipes not labeled as flushable and other non-flushable materials such as feminine hygiene products, paper towels, and facial tissues.  Given the disproportionate amounts of such non-flushable wipes found in wastewater systems nationwide, consumers appear to do so regularly.

78.     Wastewater personnel have consistently recognized that non-flushable materials are a significant problem and a far greater problem for wastewater systems than flushable wipes.

79.     For example, in 2013, the then-Manager of Sewer Pumping for DC Water, Hiram Tanner, Jr., explained to INDA, in an email on which wastewater associations were copied: "Many of the items that cause problems in the wastewater industry have nothing to do with your products—in my operation I have seen concrete, toys, animals, car engines (truly non dispersible by my definition), you name it . . . ."

80.     The same year, Robert Villee, Executive Director for the Plainfield Area Regional Sewerage Authority and a WEF representative wrote Cynthia Finley of NACWA, who testified

in connection with the Act, to say: "[Y]ou may be going after the wrong wipe—I think we are pretty much in agreement that most of the problem goes away if we get baby wipes, as they are now constructed out of our sewers . . . ."  He added that baby wipes presented a "distinct" issue from flushable wipes, and concluded that baby wipes are "the main problem" facing municipal wastewater operators.

81.    Similarly, in 2014, Mr. Villee stated: "[i]f flushable wipes . . . leave the marketplace the consumer will seek out alternatives, namely baby wipes. . . . Regulating flushable wipes instead of personal hygiene wipes could actually cause the problems in our sewers to become worse."

82.    And in 2016, Dr. Finley of NACWA was quoted by the media as saying: "What we really don't want is a ban on wipes (being) called flushable," and the article paraphrased her explanation that "research has shown people instead will buy baby wipes—a plastic product that will cause just as much, if not more, damage."

83.    Nowhere does the legislative record for the Act address these potentially serious negative repercussions of prohibiting flushable wipes such as Kimberly-Clark's from being called flushable.

84.    The fiscal impact statement adopted in the Act, D.C. Law, § 7, does not mention the potential for increased costs to the District of Columbia that may result from having to remediate the consequences of consumers' increased use of baby wipes and other wipes with permanent wet strength once wipes currently labeled flushable instead "must [be] clearly and conspicuously label[ed]" non-flushable.  *Id.* § 3(b).

85.    In a January 25, 2017 editorial about the Act that was published in the *Washington Examiner*, Mr. Tanner, DC Water's former Manager of Sewer Pumping,

summarized: "many of the banned products' users will be sure to turn to non-flushables and

flush them anyway, aggravating the Fatberg problem."[5]

## CLAIMS FOR RELIEF

### Count I

**For Declaratory and Injunctive Relief Based
Upon Violations of the Commerce Clause—Discriminatory and Extraterritorial Effects**

**(U.S. Const. art. I, § 8, cl. 3, 42 U.S.C. § 1983)**

86.     The previous paragraphs in the Complaint are incorporated by reference.

87.     Article I, Section 8, Clause 3 of the United States Constitution provides that the

Congress shall have the power "[t]o regulate Commerce . . . among the several States . . . ."  This

provision "reflects the Constitution's special concern both with the maintenance of a national

economic union unfettered by state-imposed limitations on interstate commerce and with the

autonomy of the individual States within their respective spheres."  *Healy v. Beer Inst., Inc.*, 491

U.S. 324, 335-36 (1989).  The Commerce Clause thus "precludes the application of a state statute

to commerce that takes place wholly outside of the State's borders."  *Id.* at 336.  In particular, a

"statute has undue extraterritorial reach and 'is per se invalid' when it 'requires people or

businesses to conduct their out-of-state commerce in a certain way.'"  *North Dakota v. Heydinger*,

825 F.3d 912, 919 (8th Cir. 2016).  Consistent with this, District legislation has been found

unconstitutional where it applied to manufacturers and licensees located out-of-district but not

retailers based in the district, because, in such a situation, "it is impossible to contend that this

particular application of the D.C. Act does not effect an impermissible extraterritorial reach."

*Pharm. Research & Mfgs. of Am. v. Dist. of Columbia*, 406 F. Supp. 2d 56, 69-70 (D.D.C. 2005),

*aff'd on other grounds*, 496 F.3d 1362 (Fed. Cir. 2007).

---

[5] "Fatberg" is what the media named a multi-ton clump of waste removed from a London sewer in 2014, which contained cooking oil and other fats bound up with paper products and other debris.

88.     As noted above, Kimberly-Clark does not manufacture its flushable wipes—or any of its products—in the District of Columbia.

89.     Kimberly-Clark likewise does not research or design its flushable wipes in the District of Columbia.

90.     Kimberly-Clark does not sell flushable wipes directly to consumers in the District, and it does not sell flushable wipes to retailers or wholesalers in the District. Kimberly-Clark does sell flushable wipes to national wholesalers and entities that may, based on their own independent choices, decide to sell flushable wipes to intermediate purchasers or consumers in the District.

91.     Kimberly-Clark, once it sells its nonwoven disposable products to wholesalers and other entities, does not control whether these products are sold into the District.

92.     The Act does not regulate the conduct of such wholesalers or retailers of flushable wipes. Those entities therefore can sell Kimberly-Clark's flushable wipes or other manufacturers' wipes labeled as flushable in the District without legal repercussions. Those entities can market and advertise flushable wipes to increase their own sales and profits in the District, while leaving Kimberly-Clark and other manufacturers liable for those retail sales in the District.

93.     No other jurisdiction in the United States has enacted a similar ordinance. If the Act goes into effect, Kimberly-Clark will be forced to redesign its labeling—at significant cost— to avoid incurring liability (due to its buyers' and subsequent buyers' independent decisions) despite that it does not directly introduce flushable wipes into the District. Because of the nature of Kimberly-Clark's sale of its flushable wipe products and the nature of wholesale and retail sales in the United States, unless Kimberly-Clark removes the "flushable" label from all flushable wipes it manufacturers and substitutes the "clear[] and conspicuous[]" "not . . . flush[able]" label mandated by the Act, it will be unable to protect itself from liability in the District. Further, the

Act infringes upon Kimberly-Clark's constitutional rights, creating legal injuries that cannot be sufficiently remedied through an award of damages. *See, e.g.*, *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 (2010); *Ex Parte Young*, 209 U.S. 123, 155-56 (1908).

94.    In regulating Kimberly-Clark's extraterritorial conduct by compelling such a labeling change, the Act also will override the policy decisions of other municipalities and sovereigns outside the District.  Take, for instance, Chicago, where the operations manager of the "largest waste water plant on earth," has stated that the Water Reclamation District of Greater Chicago has not experienced "any operational issues" related to wet wipes.[6]  In doing so, the operations manager attributed the lack of problems to "the good habits of [C]ook [C]ounty citizens," which may well mean that those citizens are predominantly flushing wipes labeled as flushable rather than *non*-flushable wipes such as baby wipes.  Yet, if Chicago wants its citizens to continue to flush Kimberly-Clark's flushable moist wipes rather than *non*-flushable baby wipes (because Kimberly-Clark's flushable wipes are far safer to flush for consumers and municipalities) and accordingly wants its citizens to be fully informed about which category of wipes they are purchasing, the Act will veto Chicago's choice.  To avoid liability here in the District, in *Chicago* (and nationwide), Kimberly-Clark's Cottonelle®, Scott Naturals® and other flushable wipes will need to be stripped of their current "flushable" label and, more significantly, be "clearly and conspicuously label[ed] . . . not  . . . flushable," just as truly *non*-flushable wipes are labeled.

---

[6] WGN, *Flushable Wipes Causing a Stink in Some Sewers: Is a Clog Coming to Cook County?* (Mar. 10, 2016), *available  at*  http://wgntv.com/2016/03/10/flushable-wipes-causing-a-stink-in-some-sewers-is-a-clog-coming-to-cook-county/

## Count II

### For Declaratory and Injunctive Relief Based
### Upon Violations of the Commerce Clause—Undue Burden

### (U.S. Const. art. I, § 8, cl. 3, 42 U.S.C. § 1983)

95.     The previous paragraphs in the Complaint are incorporated by reference.

96.     The Commerce Clause also prohibits states from imposing an undue burden on interstate commerce that outweighs the local benefits of the legislation.  *See Pike v. Bruce Church*, 397 U.S. 137, 142 (1970).

97.     As discussed above, neither Kimberly-Clark nor any other national manufacturer of flushable wipes or other nonwoven disposable products manufactures such products in the District.

98.     Kimberly-Clark and those manufacturers—based on Kimberly-Clark's experience in the industry—largely sell to wholesalers, distributors, or national or regional retailers, who then independently decide whether to sell the products in the District.

99.     Therefore, Kimberly-Clark and nearly all other manufacturers of nonwoven disposable products, at minimum, will be forced to comply with a labeling requirement that will make Kimberly-Clark conform its out-of-state behavior, including its labeling, to a standard set by the District.  That is, the Act will effectively prohibit Kimberly-Clark's flushable wipes from being labeled "flushable" anywhere nationwide and instead require those products to be "clearly and conspicuously label[ed] not . . . flush[able]."[7]  Moreover, if other states follow the District

---

[7] The only theoretical alternative—one that is not practically available given the reality of how flushable wipes are sold—would be for Kimberly-Clark to somehow create two sets of product labeling (one continuing to call its products flushable, and another D.C.-compliant), and then to attempt to steer all products bearing the "flushable" label away from the District.  But Kimberly-Clark has no means by which to control where its products are sold at retail, and has no manner of controlling the further sales of flushable wipes by flushable wipe buyers.

by imposing their own standards for flushability, Kimberly-Clark and other manufacturers will be forced to navigate a Balkanized regulatory framework.  Under any of these scenarios, a national market for flushable wipes will cease to exist.

100.    These costs associated with establishing and maintaining this new localized sale arrangement would be substantial.  That is particularly true because Kimberly-Clark and other manufacturers would have to find ways to impose controls on the many unaffiliated companies involved in the distribution of disposable wipes in order to have any hope of avoiding the significant liability imposed by the Act if a product manufactured, e.g., for sale in Maryland or Virginia, ultimately enters the District.

101.    These harms to interstate commerce, which would affect all national manufacturers of nonwoven disposable products, entirely outweigh the putative local benefits, which for multiple reasons are minimal, or even non-existent.

102.    First, any conceivable local benefit must be minimal because the purported problem the Act attacks is already *de minimis*.  As DC Water claimed in support of the Act, its cost to address clogs related to wipes of all kinds (not merely flushable wipes) is $50,000 per year, less than a thousandth of a percent of its $535.8 million budget.

103.    Second, the Act will not meaningfully affect the perceived problem because it does not limit the impact of flushable wipes, let alone truly non-flushable nonwoven disposable products, actually sold in the District.  No retailer or buyer of flushable wipes is regulated by the Act.  Nor does the Act prohibit users of flushable wipes or other nonwoven disposable products not labeled as flushable from flushing those products.

104.    Third, any purported benefit to the District necessarily is further limited because the wastewater treated by the District is significantly comprised of wastewater that enters the

sewer system in Maryland and Virginia, localities that of course are not subject to D.C. regulation.

105.    Fourth, the Act lumps together as "non-flushable" both products not designed to be flushed (e.g., baby wipes) and those products currently labeled "flushable," which are designed to lose strength, disperse, and degrade so that they may safely be flushed.  As set forth above, individuals associated with WEF and NACWA have recognized that this is likely to cause significant harms to the District's municipal wastewater system because consumers will no longer be able to distinguish between wipes designed to be flushed and permanent wet strength wipes that are not designed to be flushed, but will nonetheless continue flushing whatever wipes they use after toileting.

106.    Because the Act imposes burdens on interstate commerce that far outweigh any local benefit attributable to the Act, the Act violates the Commerce Clause and is unconstitutional.

## Count III

### For Declaratory Relief And Injunctive Relief
### Based Upon Violations Of The First Amendment—Unlawful Restraint of Speech

### (U.S. Const. amend. I, 42 U.S.C. § 1983)

107.    The previous paragraphs in the Complaint are incorporated by reference.

108.    Under the First Amendment, government regulation that discriminates against targeted speakers and disfavored content is presumptively invalid and subject to heightened scrutiny.  *See Sorrell v. IMS Health Inc.*, 131 S. Ct. 2655, 2663-67, 2672 (2011).

109.    The Act purports to limit the speech only of "manufacturers," *see* D.C. Law 21-220, § 3(a), and it precludes those manufacturers from labeling its products as "flushable," *id.*

110.    A retailer or wholesaler could market or advertise the very same products as flushable in whatever medium it chose—including, for example, in a store display or in an online banner.

111.    This speaker- and content-based restriction is not narrowly tailored and does not relate to any compelling government interest.  The Act is therefore invalid under strict scrutiny.

112.    Further, this regulation, which flatly prohibits manufacturers from describing wipes as "flushable" without District approval, would not survive intermediate scrutiny even if it were assessed under the comparatively less exacting standards that apply to commercial speech restrictions.  *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562-65 (1980).  There is no indication that the District considered less speech-restrictive means, such as requiring disclosures at the point of sale, to achieve its regulatory aims.  Moreover, a disconnect exists between the asserted aims of the Act—to limit the flushing of nonwoven products that do not disperse in the District's sewer system—and its actual operation.  As discussed above, the Act does not prohibit the local sale or flushing of flushable wipes.  Nor does it prohibit the sale or flushing of non-flushable wipes or other non-flushable products that consumers are known to flush and that are known to cause significant problems for municipal wastewater treatment.  It merely regulates how manufacturers speak about them.

113.    There is no evidence in the legislative record to support the notion that such a regulation of speech will alleviate or mitigate the problems the District faces with respect to items that are found in its wastewater system.  Because it is well known that consumers continue to flush non-flushable items and will turn to wipes with permanent wet strength if they no longer can determine which wipes are, in fact, designed to be flushed, it is speculation and conjecture to surmise that the content- and speaker-based restrictions on speech will benefit the District.  As

such, the Act lacks the direct and substantiated means-ends fit necessary for a speech restriction to survive intermediate scrutiny.  *See Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 525 (D.C. Cir. 2015) (holding regulation on commercial speech violated the First Amendment where the proposed benefit of the legislation was "entirely unproven and rests on pure speculation").

114.    The Act is therefore an invalid restraint on commercial speech.

## Count IV

### For Declaratory Relief And Injunctive Relief
### Based Upon Violations Of The First Amendment—Compelled Speech

### (U.S. Const. amend. I, 42 U.S.C. § 1983)

115.    The previous paragraphs in the Complaint are incorporated by reference.

116.    Under the First Amendment, government may compel disclosure only "of purely factual and uncontroversial information about the good or service being offered."  *Nat'l Ass'n of Mfrs.*, 800 F.3d at 527 (citation omitted).

117.    The Act purports to compel Kimberly-Clark and manufacturers to label their nonwoven disposable products as "not flushable" despite the fact that Kimberly-Clark's products are designed to be flushed, employ patented technology that makes them lose strength and disperse just as toilet paper does when flushed (albeit, not as quickly as most), are tested under numerous benchmarks to assess flushability, which substantiation was fully vetted by the FTC, and are wholly distinct from nonwoven products like baby wipes that are made of plastic and have permanent wet strength.  D.C. Law 21-220, § 3(b).  In short, Kimberly-Clark has a well-founded belief that its specially designed products are flushable, but the Act would require Kimberly-Clark to say that they are "not flushable," all evidence to the contrary.

118.    The District's mandate that Kimberly-Clark describe its specially designed and patented flushable wipes as non-flushable—the same label that applies to the aforementioned

plastic-based wipes with permanent wet strength—does not involve "purely factual and uncontroversial information." Nor does the Act require Kimberly-Clark to advise consumers of D.C.'s conclusion (right or wrong) about the attributes of the product. The Act instead requires Kimberly-Clark to describe its own product in its own voice, but in language dictated by D.C. law—terms that Kimberly-Clark firmly believes are inaccurate and misleading. It thus compels Kimberly-Clark to make a controverted statement that Kimberly-Clark does not believe.

119.    As a result, § 3(b) is unconstitutional. *Nat'l Ass'n of Mfrs.*, 800 F.3d at 527, 529-30.

### Count V

**For Declaratory Relief And Injunctive Relief
Based Upon Violations Of Due Process**

**(U.S. Const. amends. I, V, 42 U.S.C. § 1983)**

120.    The previous paragraphs in the Complaint are incorporated by reference.

121.    The Due Process Clause of the Fifth Amendment requires statutes imposing criminal and civil penalties to be clear enough "to provide a person of ordinary intelligence fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 304 (2008). Such statutes cannot be "so standardless that [they] authorize[] or encourage[] seriously discriminatory enforcement." *Id.*

122.    The Act relies throughout on vague and ambiguous terms that render the Act void. For instance, the Act requires that for a wipe to be labeled flushable it must "[d]isperse in a short period of time after flushing in the low-force conditions of a sewer system," but without defining or giving any notice of, *inter alia*, how much the product must disperse, what constitutes a "short period," and what constitutes "the low-force conditions."

123.    Similarly, the Act requires that a wipe labeled as flushable must "not [be] buoyant" without setting any parameters for defining buoyancy despite that even toilet paper and human excrement themselves may be buoyant.

124.    The Act also requires that to be labeled as flushable a wipe may not contain "any . . . material that does not readily degrade in a range of natural environments," without setting any parameters to define what it means to "readily degrade," much less what the "range of natural environments" consists of.  For example, the Act gives no indication whether Kimberly-Clark's flushable wipes are deemed non-flushable simply because they do not degrade within minutes or hours when exposed to air (surely a "natural environment[]")—which, of course, Kimberly-Clark's flushable wipes do not because they require exposure to water to release their ionic bonds.

125.    Indeed, the Act's definition of flushable has not previously been used by the nonwovens industry, wastewater associations, or federal or state legislators or regulators.

126.    For all these reasons, Kimberly-Clark has no notice of whether its products are "flushable" or not, under the District's purported definition. Therefore, it is at imminent risk of being held vicariously liable for retailers' intentional sales of Kimberly-Clark's popular flushable wipes to consumers within the District.  Again, Kimberly-Clark has no meaningful way to avoid liability except by discontinuing its use of the flushable label and labeling all products manufactured in the future as "nonflushable."  Further, even if Kimberly-Clark did take such far-reaching nationwide measures to avoid liability in the District, those efforts might well not succeed.  Given how long it may take, after manufacturing, for its flushable wipes to reach the retail market in the District, Kimberly-Clark would face years of potential retroactive liability if

products manufactured prior to the Act's enforcement date reach consumers in D.C. after traveling through distribution networks that Kimberly-Clark does not control.

127.     Furthermore, the Act seeks to hold manufacturers liable for the sale of products, which under the Act have improper labels.  Kimberly-Clark manufactures flushable wipes, but as explained, ¶¶ 6-7, *supra*, it does not sell any such products in the District.  Nor does it sell flushable wipes with the specific knowledge or intention that they will be sold in the District. Whether Kimberly-Clark's flushable wipes are sold in the District is determined by the actions of people and entities unaffiliated with Kimberly-Clark, whom Kimberly-Clark does not control. Further, these independent actors have no incentive to refrain from reselling Kimberly-Clark's products into the District, for the simple reason that the Act does not apply to their conduct or prohibit them from doing so.

128.     The Act therefore seeks to impose liability, including potentially civil penalties, on Kimberly-Clark for the actions of others.

129.     This extension of liability offends recognized notions of Due Process and is unconstitutional.

## **Count VI**

### **For Declaratory Relief Based Upon The Declaratory Judgment Act**
### **(28 U.S.C. §§ 2201-2202)**

130.     The previous paragraphs in the Complaint are incorporated by reference.

131.     Under 28 U.S.C. § 2201, in a case of "actual controversy within its jurisdiction," "any court of the United States ... may declare the rights and other legal relations of any party seeking such declaration."

132.     Kimberly-Clark brings an actual controversy within the jurisdiction of this court because it will be injured as a direct result of Defendants' enforcement of the Act.

133.    Further, Kimberly-Clark is directly subject to the Act as a manufacturer of disposable wipes; indeed it is part of the class of actors whose behavior the Act targets.

134.    Kimberly-Clark is subject to civil penalties if it does not comply with the Act.

135.    Kimberly-Clark has a right not to be subjected to government action that is contrary to law.  The Act violates those rights because it conflicts with the United States Constitution.

136.    Accordingly, Kimberly-Clark entitled to a declaratory judgment that the Act is contrary to law and cannot be enforced.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully prays that this Court:

A.    Issue an order granting injunctive relief in favor of Kimberly-Clark and against Defendants that prohibits Defendants from enforcing the Nonwoven Disposable Products Act of 2016;

B.    Declare that the Act is unconstitutional and may not be implemented or enforced;

C.    Award Kimberly-Clark its costs and expenses; and

D.    Award such further and additional relief as is just and proper.

Dated:  September 15, 2017

Respectfully Submitted,

_____

Eamon P. Joyce (Bar No. 483127)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone:  212-839-5300
Facsimile:  212-839-5599
ejoyce@sidley.com

Kwaku A. Akowuah (Bar No. 992575)*
Christopher A. Eiswerth (Bar No. 1029490)*
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, D.C. 20005
Telephone: 202-736-8000
Facsimile: 202-736-8711
kakowuah@sidley.com
ceiswerth@sidley.com

*Counsel for Plaintiffs*

*Petitions for admission pending