**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KIMBERLY-CLARK CORPORATION,<br><br>*Plaintiff*,<br><br>v.<br><br>THE DISTRICT OF COLUMBIA et al.,<br><br>*Defendants*. | Case No. 17-cv-01901<br><br>Hon. James E. Boasberg<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF KIMBERLY CLARK CORPORATION'S
<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

Eamon P. Joyce (Bar No. 483127)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone: 212-839-5300
Facsimile: 212-839-5599
ejoyce@sidley.com

Kwaku A. Akowuah (Bar No. 992575)
Christopher A. Eiswerth (Bar No. 1029490)*
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: 202-736-8000
Facsimile: 202-736-8711
kakowuah@sidley.com
ceiswerth@sidley.com

*Counsel for Plaintiff*

* Petition for Admission Pending

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 3

I.  KIMBERLY-CLARK'S FLUSHABLE WIPES. ............................................... 3

II.  KIMBERLY-CLARK'S FLUSHABLE WIPES MEET OR EXCEED INDUSTRY AND FEDERAL LABELING STANDARDS FOR FLUSHABLE LABELING...................... 5

    A.  Kimberly-Clark Complies With Industry Standards................................. 5

    B.  Kimberly-Clark's Flushable Wipes Have Satisfied The Federal Government....... 7

    C.  Flushable Wipes Do Not Cause Clogs Of Municipal Water Systems. ................... 8

III.  THE NONWOVEN DISPOSABLE PRODUCTS ACT OF 2016. .................................. 11

LEGAL STANDARD.............................................................................................. 15

ARGUMENT ......................................................................................................... 16

I.  KIMBERLY-CLARK WILL LIKELY PREVAIL ON THE MERITS OF ITS CLAIMS. ................................................................................................. 18

    A.  The Act Violates The Commerce Clause............................................... 18

        1.  The Act is *per se* invalid because it directly regulates commercial conduct that takes place outside the District's borders........................................... 19

        2.  The Act will impose a substantial burden on interstate commerce that far outweighs any conceivable local benefits.................................................. 23

    B.  The Act Violates The First Amendment.......................................... 26

        1.  The Act impermissibly imposes a speaker-based and content-based restraint on commercial speech............................................................... 27

        2.  The Act impermissibly prohibits manufacturers from engaging in protected commercial speech while compelling them to instead parrot the District's view on a contested issue of public concern. ........................... 30

            a.  There is no evidence that the Act would advance the government's asserted interest "directly" if at all................................................. 32

            b.  The Act is unconstitutional because it is not "narrowly drawn." . 34

    C.     The Act Violates The Fifth Amendment. ................................................................ 37

        1.     The Act Is Void For Vagueness. .................................................................... 38

        2.     The Act Impermissibly Punishes Manufacturers For Their Lawful Conduct In Other States............................................................................................ 39

II.    A PRELIMINARY INJUNCTION IS NECESSARY TO PROTECT KIMBERLY-CLARK AGAINST IRREPARABLE HARM. ................................................................ 41

III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST CONSIDERATIONS WEIGH STRONGLY IN FAVOR OF PRELIMINARY RELIEF. ................................. 42

CONCLUSION ....................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Aamer v. Obama,*
    742 F.3d 1023 (D.C. Cir. 2014) ...................................................................................15, 42

*Am. Beverage Ass'n v. City & Cty. of San Francisco,*
    --- F.3d ---, 2017 WL 4126944 (9th Cir. Sept. 19, 2017) ...................................35, 36

*\* Am. Meat Inst. v. U.S. Dep't of Agric.,*
    760 F.3d 18 (D.C. Cir. 2014) ...............................................................................27, 31, 35

*Austin v. United States,*
    509 U.S. 602 (1993) ............................................................................................................44

*Bates v. State Bar of Ariz.,*
    433 U.S. 350 (1977) ............................................................................................................34

*Boos v. Barry,*
    485 U.S. 312 (1988) ...........................................................................................26, 28, 29, 30

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,*
    476 U.S. 573 (1986) ...................................................................................................18, 19, 23

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
    447 U.S. 557 (1980) ...............................................................................................30, 31, 34

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ............................................................................................................30

*Comptroller of the Treasury of Md. v. Wynne,*
    135 S. Ct. 1787 (2015) .......................................................................................................18

*\* Edenfield v. Fane,*
    507 U.S. 761 (1993) ...........................................................................................31, 32, 33, 34

*Edgar v. MITE Corp.,*
    457 U.S. 624 (1982) ............................................................................................................18

*Eu v. S.F. Cty. Democratic Cent. Comm.,*
    489 U.S. 214 (1989) ............................................................................................................28

*Gates & Fox Co. v. Occupational Safety and Health Review Comm'n,*
    790 F.2d 154 (D.C. Cir. 1986) ...........................................................................................39

\* *Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) ......................................................................16, 42

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ...............................................................................................37

\* *Healy v. Beer Instit., Inc.*,
    491 U.S. 324 (1989) .........................................................................18, 19, 21, 22, 24

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ..............................................................................................28, 37

*Huntington v. Attrill*,
    146 U.S. 657 (1892) ...............................................................................................39

*Ibanez v. Fla. Dep't of Bus & Prof'l Regulation*,
    512 U.S. 136 (1994) ...........................................................................................28, 31

*J. McIntyre Mach., Ltd. v. Nicastro*,
    564 U.S. 873 (2011) ...............................................................................................39

*Legato Vapors, LLC v. Cook*,
    847 F.3d 825 (7th Cir. 2017) ................................................................................21

*Matal v. Tam*,
    137 S. Ct. 1744 (2017) ...........................................................................................33

*Mem'l Hosp. v. Maricopa Cty.*,
    415 U.S. 250 (1974) ...............................................................................................29

*Meyer v. Holley*,
    537 U.S. 280 (2003) ...............................................................................................40

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
    559 U.S. 229 (2010) ...........................................................................................31, 32

*Mills v. District of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) ............................................................................42

*Milton S. Kronheim & Co. v. District of Columbia*,
    91 F.3d 193 (D.C. Cir. 1996) ................................................................................19

\* *Nat'l Ass'n of Mfrs. v. SEC*,
    800 F.3d 518 (D.C. Cir. 2015) .............................................................32, 34, 35, 36, 37

*In re Nice-Pak Prods., Inc.*,
    Docket No. C-4556, Consent Order, 2015 WL 7009345 (F.T.C. Oct. 30, 2015) ...............8, 38

*Nken v. Holder,*
    556 U.S. 418 (2009)................................................................................42

*North Dakota v. Heydinger,*
    825 F.3d 912 (8th Cir. 2016) ................................................................20

\* *Pac. Mut. Life Ins. Co. v. Haslip,*
    499 U.S. 1 (1991)................................................................38, 39, 40, 41

\* *Pearson v. Shalala,*
    164 F.3d 650 (D.C. Cir. 1999) ........................................27, 32, 34, 35

*Pharm. Research & Mfrs. of Am. v. District of Columbia,*
    406 F. Supp. 2d 56 (D.D.C. 2005), *aff'd on other grounds*, 496 F.3d 1362
    (Fed. Cir. 2007)......................................................................................21

*Pike v. Bruce Church, Inc.,*
    397 U.S. 137 (1970)........................................................18, 19, 23, 24, 25

*Pursuing America's Greatness v. FEC,*
    831 F.3d 500 (D.C. Cir. 2016) ........................................................42, 43

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992)................................................................................28

*In re R.M.J.,*
    455 U.S. 191 (1982)........................................................................27, 34

*Rubin v. Coors Brewing Co.,*
    514 U.S. 476 (1995)................................................................................26

*Sam Francis Found. v. Christies, Inc.,*
    784 F.3d 1320 (9th Cir. 2015) ..............................................................21

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,*
    502 U.S. 105 (1991)................................................................................26

\* *Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011)..........................................26, 28, 29, 31, 33

*United States v. Sec'y, Fla. Dep't of Corr.,*
    828 F.3d 1341 (11th Cir. 2016) ............................................................29

*United States v. Williams*,
  553 U.S. 285 (2008)........................................................................................38

*V-1 Oil Co. v. Utah State Dep't of Pub. Safety*,
  131 F.3d 1415 (10th Cir. 1997) ....................................................................23

*Watters v. Wash. Metro. Area Transit Auth.*,
  295 F.3d 36 (D.C. Cir. 2002).........................................................................44

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)....................................................................................16, 42

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
  471 U.S. 626 (1985).......................................................................................33

**Statutes**

U.S. Const. amend V.............................................................................................37

U.S. Const. art. I, § 8, cl. 3..................................................................................18

D.C. Code § 2-505 ...............................................................................................15

D.C. Law 21-220.......................................................................................... *passim*

**Other Authorities**

6 Callmann on Unfair Comp., Tr. & Mono. § 23:47 (4th Ed.)......................................44

57 DCR 181 (Jan. 8, 2010) ..................................................................................44

D.C. Council, Committee Report for Bill B21-0833 (Nov. 7, 2016) .................... *passim*

D.C. Council, Hearing Record for Bill B21-0833 (Oct. 24, 2016)...................... *passim*

EPA, *Wastewater Technology Fact Sheet* (June 2003),
  https://www3.epa.gov/npdes/pubs/final_sgrit_removal.pdf...................................29

INDA/MWWCA, *Collection Study Jan. 10 & 11, 2012 at Westbrook Pumping
  Station, Me* (Jan. 2012),
  https://www2.nacwa.org/images/stories/public/2016-11-09maine.pdf. ................10

Nate Lynch, *Wipes Wreak Havoc on Wastewater Plants*, The Day (May 7, 2016),
  http://www.theday.com/local/20160507/wipes-wreak-havoc-on-wastewater-
  plants ...........................................................................................................25

Responsible Flushing Alliance, *INDA-MEWEA "Don't Flush Baby Wipes" Pilot Public Education Campaign* (Apr. 2015), http://www.responsibleflushingalliance.com/inda_mewea_don_t_flush_baby_wipes_pilot_public_education_campaign.............................................................30

WEF Highlights, *Save Your Pipes: Don't Flush Baby Wipes* (Mar. 30, 2016), http://news.wef.org/save-your-pipes-dont-flush-baby-wipes/ .................................................30

### INTRODUCTION

Plaintiff Kimberly-Clark Corporation respectfully moves for a preliminary injunction to enjoin the District of Columbia's Nonwoven Disposable Products Act of 2016 ("the Act"). The Act seeks to control commercial speech—the labeling of flushable moist wipes—by imposing monetary fines and penalties on manufacturers for their conduct outside the District.

The District presumably will assert otherwise, but the Act is not comparable to a run-of-the-mill labeling law—one that bars a product from being sold in a jurisdiction unless a manufacturer supplements its chosen speech with additional disclosures of purely factual information. From a constitutional standpoint, three key factors set the Act apart from such laws:

1. **The Act does not regulate local activity.** Kimberly-Clark does not manufacture flushable moist wipes in the District. Kimberly-Clark's understanding is that no other company manufactures products subject to the Act within the District. The legislative history of the Act shows that the District purposefully *exempted* local distributors, retailers, and consumers. The result is a supposedly local ordinance that regulates *non-local* manufacturing activity, and does not regulate local commercial activity. The Act thus violates the dormant aspect of the Commerce Clause, which precludes the States and the District alike from discriminating against interstate commerce and regulating commercial activity that occurs outside their borders.

2. **The Act flatly bans disfavored commercial speech.** Supplemental advertising disclosures regularly describe factual matters like a product's contents or scientifically established effects or hazards. Some of these disclosures are mandated by law; many are legally uncontroversial. But the Act is unlike any permissible supplemental disclosure requirement because it does not permit Kimberly-Clark to deliver its own factually substantiated message, *i.e.*, that Kimberly-Clark's products are flushable. The Act *prohibits* manufacturers from describing

their products as "flushable" unless the District concurs. Further, if the District decrees that a product is not "flushable," the manufacturer "must clearly and conspicuously label" the product as one that "should not be flushed." D.C. Law 21-220, § 3(a)-(b). The legislative record shows that the District adopted this restriction for a constitutionally suspect purpose—it did not want manufacturers' speech to "compromise" the District's contrary message. The Act's suppression of disfavored private speech violates the First Amendment and should be enjoined.

3.    **The Act creates an unfair and irrational punishment scheme.** The Act's unconstitutional character is underscored by its enforcement provision, which authorizes the Mayor to "impose civil fines and penalties as sanctions for violations" of the Act's labeling requirements. D.C. Law 21-220, § 4(a). These fines, however, do not attach to any conduct that is unlawful in any place where it occurs. Kimberly-Clark's labeling is entirely lawful in the States where Kimberly-Clark manufactures its flushable products and sells those products to independent third parties. It remains lawful under the Act, moreover, for local retailers to sell Kimberly-Clark's products and for local consumers to buy those products. The Act thus exposes Kimberly-Clark to civil punishment when it *lawfully* labels its products out-of-state and *lawfully* sells those products to retailers (*e.g.*, Amazon or Target), who *lawfully* sell the same products to District consumers. So far as Kimberly-Clark is aware, no governmental body in the United States has ever sought to impose punishment under such a theory. The Court should hold that Due Process forbids it.

Due Process also is violated by the Act's vague liability standard, which almost certainly will not be clarified by regulation until after the Act becomes enforceable on January 1, 2018.  For these reasons, and because the Act would cause irreparable harm to Kimberly-Clark and the equities and public interest strongly favor Kimberly-Clark, the Court should hold that a preliminary injunction is appropriate in the circumstances and should enjoin the Act.

# BACKGROUND

## I.     KIMBERLY-CLARK'S FLUSHABLE WIPES.

Kimberly-Clark is a global company that creates consumer products for personal care and professional hygiene. Compl. ¶ 5. It principally manufactures and markets a wide range of products made from paper or wood pulp, using advanced fiber, nonwovens, and absorbency technologies. *Id.* These products include disposable diapers, feminine and incontinence care products, facial tissue, paper towels, and as most relevant here, sanitary wipes and bathroom tissue. *Id.* Kimberly-Clark's brands include Cottonelle®, Scott®, Huggies®, Kleenex®, Depend®, Poise®, Pull-Ups®, Goodnites®, and Kotex®. *Id.*

Kimberly-Clark began developing flushable moist wipes in response to consumer usage surveys showing that many adult customers were using—and then flushing—baby wipes that were not designed for flushing, were not labeled safe for flushing, and can increase the incidence of plumbing clogs and create downstream consequences. *See id.* ¶ 40. Those baby wipes have been described as "indestructible squares of plastic"; they should not be flushed. *Id.*

Flushable wipes, in contrast, are designed to pass safely through household plumbing and municipal wastewater systems, and are subjected to extensive testing to ensure that they do so. Their design poses a significant engineering puzzle. On one hand, the wipes must stay strong while wet in the package and strong enough not to tear during use. On the other hand, they must be soft enough for comfort. If either element is missing, the wipes will not serve the function that consumers desire. *Id.* ¶ 43. Further, the strength and durability that flushable wipes must have in-package and during use must yield after being flushed so the wipes lose strength or disperse (essentially, break apart), unlike baby wipes that are not safe for flushing. *Id.*

Kimberly-Clark has invested millions of dollars over more than 20 years to solve this multi-faceted engineering challenge. *Id.* ¶ 44; Declaration of Lynn Matheus ¶¶ 6-8; *see* Matheus Decl. ¶ 8 (Kimberly-Clark has filed more than 100 patents related to its flushable wipes). As a result, Kimberly-Clark's flushable wipes are unique. Compl. ¶ 45. Unlike baby wipes, which are made from plastics or other synthetic fibers, Kimberly-Clark's wipes are made only from wood pulp— the same substance that is the primary ingredient in toilet tissue. *Id.*; Declaration of David Powling ¶ 14. Kimberly-Clark also uses sodium chloride (*i.e.*, salt) to bind the wood pulp together. This binding helps the wipes remain strong during usage, but also helps the wipes rapidly lose strength when flushed so they break apart. That is, much as salt dissolves in water, the sodium chloride binding dilutes when the wipes come into contact with water. The bonds that hold the wood pulp together then weaken, allowing the wipes to break apart. Compl. ¶ 46; Powling Decl. ¶ 14. Kimberly-Clark accordingly markets wipes using this technology as "flushable," and the Federal Trade Commission has closed an investigation regarding the flushability of Kimberly-Clark's products after receiving substantial submissions from Kimberly-Clark on the subject, thus allowing those products to remain on the market with flushable labeling (in contrast with FTC's complaint and consent decree involving another manufacturer's products formerly labeled flushable, *infra* pp.7-8). *See* Compl. ¶ 74; Declaration of Christopher Cole, Ex. A.

Kimberly-Clark manufactures and labels its flushable wipes in South Carolina, and occasionally labels them in Wisconsin. Compl. ¶¶ 2, 4; Matheus Decl. ¶ 5. Kimberly-Clark does not manufacture or label any of its flushable wipes in the District, nor does it manufacture or label *any* product in the District. Compl. ¶ 37; *see* Matheus Decl. ¶ 5. To Kimberly-Clark's knowledge, no entity manufactures flushable wipes or other nonwoven products in the District. Compl. ¶ 37; *see* Matheus Decl. ¶ 10.

Kimberly-Clark also does not sell any of its flushable wipes directly to consumers in the District or elsewhere. Compl. ¶ 38; *see* Matheus Decl. ¶ 11. Rather, Kimberly-Clark sells its products to unaffiliated business entities, including retailers and wholesalers, through a variety of contractual arrangements. These unaffiliated companies, in turn, distribute and sell Kimberly-Clark's products to consumers, and, as such, independently decide whether to sell flushable wipes to District residents or to retail stores in the District. Compl. ¶¶ 6, 38; *see* Matheus Decl. ¶¶ 11-12.

Because Kimberly-Clark's flushable wipes have a long shelf life, months or years may pass between the time the wipes are manufactured (and labeled) and the time they are purchased by a consumer. Compl. ¶ 7; Powling Decl. ¶ 13. This makes it possible for wipes to be transferred through multiple hands, along a lengthy distribution chain. Matheus Decl. ¶¶ 11-12, 15. The upshot is that Kimberly-Clark does not control where or when its products, including flushable wipes, are sold. *Id.* When a package of Kimberly-Clark flushable wipes arrives in the District, it is because the stream of commerce—a chain of commercial decisions made by actors independent of Kimberly-Clark—has carried the product here. Matheus Decl. ¶¶ 11-12, 15-16.

## II. KIMBERLY-CLARK'S FLUSHABLE WIPES MEET OR EXCEED INDUSTRY AND FEDERAL LABELING STANDARDS FOR FLUSHABLE LABELING.

### A. Kimberly-Clark Complies With Industry Standards.

For nearly a decade, industry organizations have promulgated standards to differentiate between products that are safe to flush—and can thus be labeled as flushable—and those that should not be labeled as flushable by manufacturers or flushed by consumers. *See* Compl. ¶ 48.

In 2004, the International Nonwovens and Disposables Association (INDA)—a primarily U.S.-based non-profit association of manufacturers in the nonwoven products industry—started working with the European Disposables and Nonwovens Association (EDANA)—a Belgium-based non-profit association for the European nonwoven products industry—to develop

flushability guidelines. *Id.* ¶ 49. In creating these guidelines, INDA and EDANA consulted with industry and wastewater agencies, *id.*, and in June 2008, published *Guidance Document for Assessing the Flushability of Nonwoven Consumer Products*, peer-reviewed guidelines designed to measure product performance through a series of up to 23 tiered tests, *id.* ¶ 50.

A short time later, in March 2009, INDA/EDANA published the *Manufacturers' Code of Practice on Communicating Disposal Pathways for Personal Hygiene Wet Wipes*. The *Code of Practice* advised manufacturers to follow the *Guidance* in deciding which products to label as flushable, and further advised them to label non-flushable products with a "Do Not Flush" symbol, as shown below. *See id.* ¶ 52.



The Director of Sustainability at the American Public Works Association (APWA), of which DC Water is believed to be a member, has stated that "[p]rominent use of the Do Not Flush logo on package labels represents a viable path forward for educating consumers and reducing the amount of non-flushable items in the wastewater system." *Id.* ¶¶ 57-58.

In July 2009, INDA and EDANA released a second edition of the *Guidance*, which further responded to wastewater authorities' concerns, and introduced a municipal pump test that Dutch authorities had devised to assess and prevent sewer pump clogging. *Id.* ¶ 51. In April 2013, INDA and EDANA released a third edition of the *Guidance*. *Id.* ¶ 53. This edition simplified and strengthened the testing scheme, now requiring a product to pass seven key tests before it can be labeled "flushable." *Id.*; *see* Powling Decl. Exs. A-C.

Kimberly-Clark's flushable wipes have always passed the INDA/EDANA guidelines; accordingly, Kimberly-Clark has always labeled these products as flushable. *Id.*¶ 54; Powling Decl. ¶ 21. Furthermore, Kimberly-Clark has not relied solely on the INDA/EDANA guidelines. *See* Powling Decl. ¶¶ 22-24; Cole Decl. ¶ 8. Kimberly-Clark also has routinely tested its flushable wipes' performance against more demanding metrics. It has assessed how quickly its wipes lose strength when simply sitting in water, and studied how its flushable wipes perform in real-world situations, such as in toilets, drainlines, sewage pumps, and septic tanks. Compl. ¶¶ 47, 54; Powling Decl. ¶¶ 15-16, 22-24. These tests provide further empirical support for Kimberly-Clark's decision to market and label its flushable wipes as products that are, in fact, suitable for flushing.

## B.      Kimberly-Clark's Flushable Wipes Have Satisfied The Federal Government.

Since at least 2013, the FTC has looked into flushability claims made by the manufacturers of various flushable wipes. Kimberly-Clark's products withstood FTC scrutiny; others have not.

In June 2013, the FTC requested Kimberly-Clark's cooperation with its investigation into the safety and appropriateness of disposing Kimberly-Clark's flushable-labeled wipes via the toilet. Compl. ¶ 63. Kimberly-Clark's submissions showed that its flushable wipes are, in fact, flushable, dispersible, and sewer- and septic-safe. *Id.* ¶ 64. In particular, Kimberly-Clark explained how its patented technology allows its flushable wipes to rapidly lose strength and break down in water, showed that its flushable wipes exceed the INDA/EDANA guidelines' criteria, demonstrated that its flushable wipes lose strength when sitting in water, and revealed how its flushable wipes continue to lose strength, break apart, disperse, and biodegrade in municipal wastewater systems. *Id.* Kimberly-Clark's submissions also explained that its flushable wipes have been praised by professionals in the wastewater community and that Kimberly-Clark is an industry leader in implementing the Do Not Flush logo and engaging in consumer education campaigns. *Id.* ¶ 65; *see also* Declaration of Melinda Langelin ¶ 12 & Exs. A-B; Powling Decl. ¶ 4.

During this time, the FTC also investigated other manufacturers' wipes labeled flushable. For instance, the FTC reviewed Nice-Pak Products, Inc.'s wipes that were then on the market and its claim that they were flushable. Compl. ¶ 67. The FTC filed a complaint asserting that Nice-Pak's claims were unsubstantiated in violation of the FTC Act because its products "d[id] not break down in water in a reasonably short amount of time" and, as a result, "c[ould] clog household [plumbing] systems, household septic systems, public sewer systems, and sewage treatment plant systems after being flushed." *Id.*; *see In re Nice-Pak Prods., Inc.*, Docket No. C-4556, Complaint ¶ 2 (Oct. 13, 2015).[1] In a consent order, Nice-Pak agreed to cease making representations that its wipes at issue were flushable unless it could identify evidence sufficient to substantiate its claims "that the Covered Product disperses in a sufficiently short amount of time after flushing to avoid clogging, or other operational problems in, household and municipal sewage lines, septic systems, and other standard wastewater equipment." Compl. ¶ 68; *In re Nice-Pak Prods., Inc.*, Docket No. C-4556, Consent Order, 2015 WL 7009345, at *3-4 (F.T.C. Oct. 30, 2015).[2]

On November 13, 2015, FTC asked Kimberly-Clark to demonstrate that its flushable wipes satisfy the *Nice-Pak* consent order standard. Compl. ¶ 72; Cole Decl. ¶ 6. Kimberly-Clark responded by submitting a white paper in February 2016. Compl. ¶ 73. After receiving the white paper, the FTC closed its inquiry. *Id.* ¶¶ 73-74; *see* Cole Decl., Ex. A (FTC closure letter).

**C.     Flushable Wipes Do Not Cause Clogs Of Municipal Water Systems.**

The FTC's decision to close its investigation after receiving information about the design and function of Kimberly-Clark's flushable wipes is unsurprising because those wipes are indeed

---

[1] *Available at* https://www.ftc.gov/system/files/documents/cases/151102nice-pakcmpt.pdf.

[2] During the notice-and-comment period on this consent order, Dr. Cynthia Finley of the National Association of Clean Water Agencies (NACWA) expressed NACWA's view that this standard was "appropriate." Compl. ¶ 70.

flushable and, accordingly, do not cause clogs of the District's—or any other jurisdiction's—municipal wastewater systems. Indeed, several studies of municipal wastewater systems have confirmed that wipes designed for flushing are rarely even *present* in municipal wastewater systems, and there are no determinations that such wipes, when found, cause or contribute to the clogs experienced by wastewater systems. As noted above, Kimberly-Clark wipes lose strength very rapidly; they would have a fraction of their in-package strength by the time they reached a municipal conveyance system, if they had not already broken down completely.

In 2010, a University of California, Berkley, graduate student collected, sorted, and cataloged materials from the inlet bar screens of a municipal wastewater pump at Moraga, California. Compl. ¶ 60; *see* Powling Decl. ¶ 26-27 & Ex. E. This academic study was initially conducted under the supervision of nonwoven industry personnel (including a Kimberly-Clark employee) and representatives from California municipalities. Compl. ¶ 60. The study examined materials collected from a number of different samples and assessed the materials found in each. Across samples, the study found that flushable wipes accounted for just 1% to 8% of materials recovered from bar screens. Powling Decl. ¶ 27. The vast majority of the recovered materials were products that were never designed to be flushed, were not labeled as flushable, and should not have been flushed. For example, paper hand towels accounted for approximately half of the collected materials (ranging from 45% to 68%). Feminine hygiene products accounted for another 5% to 10%. Non-flushable personal hygiene wipes—wipes that had not been designed for flushing and were not labeled as flushable accounted for 9% to 21%. And non-flushable household surface cleaning wipes—which also were not marketed as flushable and should not have been flushed—made up another 8% to 19%. *Id.*

In 2011 and 2012, wastewater and nonwoven industry personnel jointly conducted similar studies in Portland, Maine, and found similar results. *Id.* The flushable wipes ranged from 8-17% of materials found, with paper products (*e.g.*, paper towels) ranging from 34-44%, baby wipes from 12-24%, feminine hygiene products from 14-22%, medicated wipes from 1-4%, cosmetic wipes 1-3%, and facial/body wipes 0-2%. *See* Powling Decl. ¶ 29 & Exs. F-G. These results are well-known within the wastewater community; indeed, NACWA published the 2012 Maine study on its website.[3] The 2012 Maine study concluded, "[t]here was a discussion among the group on public education programs and it was agreed that focusing on Baby Wipes *was a priority due to their volume in the waste streams and their indestructible nature*. Household wipes would/may also be considered, because of their construction and size." *Id.* ¶ 29 (emphasis added).

In 2016, as its City Council was considering legislation regarding flushable wipes, New York City commissioned a similar study of trash in its wastewater system. *See id.* ¶ 30 & Ex. H. Unlike the California and Maine studies, wastewater personnel conducted the New York City study without any input from industry participants. *Id.* ¶ 30; *see* Compl. ¶ 61. Not surprisingly given improvements to the technologies used in flushable wipes in the intervening years, the New York City study showed that wipes designed to be flushed account for a tiny share of the materials found in wastewater systems. Flushable wipes accounted for *less than 2%* of the material found. Powling Decl., Ex. H, tbls.2 & 4. *None* of the collected wipes collected had been manufactured by Kimberly-Clark (the California and Maine studies did not identify wipes by manufacturer). Powling Decl. ¶ 31. The overwhelming majority of the materials collected in the New York study were items not designed or labeled for flushing. Paper towels made up 18.6% to 29.88% of the count. Baby wipes made up nearly 30%. Feminine hygiene products constituted about 5%. Another

---

[3] *Available at* https://www2.nacwa.org/images/stories/public/2016-11-09maine.pdf.

30%, give or take, was simple household trash. *See id.* & Ex. H, Tables 2 & 4. New York City did not enact legislation regarding flushable wipes.

## III.    THE NONWOVEN DISPOSABLE PRODUCTS ACT OF 2016.

On July 12, 2016, District of Columbia Councilmember Mary M. Cheh introduced the Act, Compl. ¶ 22, stating that it was designed to address "significant and costly clogs" in the District's sewer system that are allegedly caused when certain wipes "bind with fats, oil, and grease" and block the flow of waste water. D.C. Council, Committee Report for Bill B21-0833, at 2 (Nov. 7, 2016) ("Committee Report"). These blockages, according to the Committee Report, cost DC Water $50,000 per year—0.00000933% of the agency's $535.8 million budget. Compl. ¶ 22 n.1.

Neither the report, nor any other District publication, analyzes the composition of clogs in the District's sewers, much less the composition of the waste in the District's sewers. There is no indication that the District has ever conducted a collection study like those discussed above, *see* Committee Report at 3, and the District has *refused* offers from the industry to conduct such studies, Powling Decl. ¶ 32 & Ex. D. This omission is significant in two respects. First, as noted, collection studies consistently show that *flushable* wipes are a very small share of the waste materials in sewers.   Second, other evidence shows that the sensational claims made in media articles and other law suits (some of them relied upon here by the District and sponsors of this Act) are completely unfounded. Once questioned under oath, municipal personnel frequently (i) *admit* they do not know what is causing clogs and other problems in their systems, and (ii) *agree* that wipes labeled as flushable perform in accord with that characterization.

For example, the Public Affairs Coordinator for the Washington Suburban Sanitary Commission had been quoted by the media making assertions about harms supposedly caused by flushable wipes, but then testified in litigation that he has "no knowledge regarding whether any

'wipes' that caused the [Commission] to [take preventative measures in its sewer pumps] were labeled as 'flushable,'" and that he has "no knowledge or opinion regarding the impact, if any, that wipes labeled as 'flushable' have had at any time to the [Commission]'s water treatment facilities or equipment." Declaration of Eamon Joyce, Ex. A (Declaration of I.J. Hudson ¶¶ 5-8 (Mar. 20, 2017)).  The former Director of Communications for San Francisco's Public Utilities Commission similarly acknowledged under oath that the wipes San Francisco was finding in its waste stream "may well have just been the kind of Lysol wipes or other wipes that people were flushing improperly," not flushable wipes. Joyce Decl., Ex. B (Dep. of Tyrone Jue, at 19 (Mar. 10, 2017)); *see id.* at 16 (adding that he did not know how to "distinguish between wipes that are labeled flushable and wipes that are not labeled flushable"). In fact, he even admitted that when he and other San Francisco personnel had referred to "flushable wipes" in education campaigns and other statements, they were really just "using flushable wipes as a shorthand for wipes" generally. *Id.* at 62. More recently, an Iowa municipality dismissed its suit against flushable wipes manufacturers with prejudice, conceding it "has not experienced any clogs or increased maintenance costs that can be attributed to flushable wipes." Joyce Decl., Ex. C (Joint Settlement Agreement, ¶ 2); *id.* ¶ 4 (admitting that it cannot visually distinguish between flushable and non-flushable wipes).[4]

---

[4] In addition, George Engel, former superintendent of operations of San Francisco's Southeast Water Pollution Control Plant, has testified that flushable wipes are "constituted differently" and perform differently from non-flushable wipes, in that flushable wipes are "designed to disintegrate in the sewer system." Joyce Decl., Ex. D (Dep. at 11:24-12:8 (Mar. 10, 2017)). Similarly, Mike Lunn, a wastewater manager in Michigan, testified that he conducted his own tests on wipes labeled as flushable in the week before his deposition, and all of them "beg[a]n to break down" during the two minutes he placed them in water. Joyce Decl., Ex. E (Dep. at 38:22-25 (Mar. 17, 2017). Mr. Lunn added that based on his own research, "I don't know if I would [still advise residents not to flush wipes marked flushable down the toilet]." *Id.* at 76-77; *see also* Jue Dep. at 56, 62-63 ("Q. ... Do you agree ... that wipes that are marketed as flushable wipes are not flushable? A. I'm uncomfortable making that blanket statement ....").

Similar evidence was presented directly to the Council during the legislative process, including a wealth of evidence that *other* products, which were never designed to be flushed, are the predominant form of waste in municipal sewers, and the only materials known to alone cause clogs and blockages. For example, at a public hearing convened by the Committee on Transportation and Environment, the President of INDA, David Rousse, testified that out of all the wipes currently on the market, only 7% are marketed to consumers as "flushable." Compl. ¶ 23. He also testified that significant technology has been developed so that these wipes break down in sewers, and that there is substantial evidence that this technology works. *Id.*

In fact, the New York City study indicates that while consumers send many more flushable wipes than baby wipes down the pipes the ratio looks very different at the other end. Roughly *twenty times* more baby wipes than flushable wipes were found in the sewers. *See* Powling Decl., Ex. H, tbls.2 & 4. This dramatic contrast between the mix of products being flushed by consumers and what is being found in the sewers supports only one conclusion: Flushable wipes are, in fact, breaking up and dispersing in the sewers, just as they were designed to do. Compl. ¶ 23; *see* Powling Dec. ¶ 31 & Ex. H.

The Act's supporters acknowledged the results of the California, Maine, and New York City studies. *See, e.g.*, D.C. Council, Hearing Record for Bill B21-0833 (Oct. 24, 2016) ("Hearing Record") (testimony of George Hawkins, at 3). They claimed that other, "field dispersion" tests were more accurate, *see, e.g.*, *id.* (testimony of Dr. Cynthia A. Finley, at 2-3 & Attach. A), but did not acknowledge the shortcomings of that form of testing (which, in any event, there also is no indication that the District performed). Among other things, those tests show that toilet paper also is found intact in municipal waste streams; do not study feminine hygiene products, non-flushable baby wipes, paper towels, or other waste found in municipal waste streams (much less dispute that

13

those things are routinely found in far greater numbers than flushable wipes); and do not subject flushable wipes found to pump testing[5] or other analysis to determine whether they are capable of causing clogs.

The Council passed the Act on December 23, 2016, and Mayor Bowser signed it on January 6, 2017. Compl. ¶ 25. The Act was transmitted to Congress on January 25, 2017, and by virtue of Congressional inaction, was adopted into District law on March 24, 2017. *Id.* ¶ 26.

Though neither Kimberly-Clark nor any other national entity manufactures or labels any such product in the District, the Act purports to direct that "[a]fter January 1, 2018, a manufacturer of a nonwoven disposable product for sale in the District shall not label the nonwoven disposable product as safe to flush, safe for sewer systems, or safe for septic systems, unless the nonwoven disposable product is flushable." D.C. Law 21-220, § 3(a). The Act does not stop at banning manufacturer speech. It imposes an affirmative speech obligation by purporting to mandate that "a manufacturer of a nonwoven disposable product for sale in the District that is not flushable must clearly and conspicuously label the nonwoven disposable product to communicate that the nonwoven disposable product should not be flushed." *Id.* § 3(b).

The Act exempts District-based entities and District-based activities from its reach. It applies exclusively to "manufacturer[s]," all of whom operate elsewhere, and does not regulate the

---

[5] *See supra* p.7 (discussing pump tests). Notably, the limited pump testing that Dr. Finley submitted to the District in connection with her testimony omits any results for non-flushable materials such as baby wipes or paper towels, which are known to cause exponentially more strain on pumps than many flushable wipes. *See* Hearing Record (testimony of Dr. Finley, Attach. B).   Indeed, Kimberly-Clark's pump testing, which INDA submitted to City Council while the Act was under consideration, showed that whereas municipal sewage pumps can readily process hundreds of flushable wipes fed into them (far outstripping the numbers of such wipes that would be found in real-world sewer conditions), a very small number of baby wipes is capable of stopping a pump. *See* Powling Decl. ¶ 24 & Ex. D.

distributors who sell consumer goods to local retailers, the sale or marketing activities of local retailers, or the purchasing or disposal activities of local consumers. *See id.* § 3.

The Act does not adopt any existing standard to define the key term "flushable," much less bear any resemblance to the dictionary definition of that term. The Act newly defines "flushable" to mean "a nonwoven disposable product that: (A) [d]isperses in a short period of time after flushing in the low-force conditions of a sewer system; (B) [i]s not buoyant; and (C) [d]oes not contain plastic or any other material that does not readily degrade in a range of natural environments." *Id.* § 2(1). These terms otherwise are left undefined by the Act, which directs the Department of Energy and Environment to promulgate rules, in "consultation with the District of Columbia Water and Sewer Authority," "to implement the provisions of th[e] [A]ct," including through "interpret[ation]." *Id.* § 5. The Act does not set any deadline for promulgating these rules. The agencies charged with the task have not yet proposed any such rules, even though District law imposes a notice-and-comment rulemaking requirement akin to the familiar mandate of the federal Administrative Procedure Act. *See* D.C. Code § 2-505.

The Act authorizes the Mayor to "impose civil fines and penalties as sanctions for violations" and the Attorney General to "seek injunctive relief or other appropriate remedy in any court of competent jurisdiction to enforce compliance with th[e] [A]ct." D.C. Law 21-220, § 4. But the Act does not say whether the Mayor or the Attorney General, or some other entity, is supposed to determine whether a particular wipe, as labeled, complies with the Act, and does not establish any guideposts for that determination. The Act becomes enforceable on January 1, 2018.

## LEGAL STANDARD

"The primary purpose of a preliminary injunction is to preserve the object of the controversy in its then existing condition—to preserve the status quo." *Aamer v. Obama*, 742 F.3d

15

1023, 1043 (D.C. Cir. 2014). A plaintiff seeking a preliminary injunction must generally show (1) a likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, and (3-4) that the balance of equities and public interest favor an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where a plaintiff seeks a preliminary injunction to restrain unconstitutional governmental action, the analysis substantially reduces to a merits inquiry because "a prospective violation of a constitutional right constitutes irreparable injury" and "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

## **ARGUMENT**

To address one slice of a concern that, at most, imposes an annual fiscal burden of $50,000 on a local agency with a $535.8 million annual budget, the District adopted a law that in practical effect reaches beyond its borders, dictates the terms of Kimberly-Clark's communicative acts in South Carolina, and imposes potentially steep monetary penalties on Kimberly-Clark if District retailers (who are not regulated by the Act) continue to sell Kimberly-Clark's flushable wipes to District consumers (who may purchase them lawfully). This ill-conceived law violates three separate constitutional limits on the power of governments to regulate and punish.

A.     The Act violates the Commerce Clause because it inappropriately seeks to regulate the extraterritorial conduct of Kimberly-Clark and other manufacturers. The law of South Carolina, where Kimberly-Clark's relevant manufacturing activities take place, allows manufacturers to label wipes designed for flushing as "flushable." The District evidently does not like South Carolina's choice or that of the other 49 States, but the District has no power to regulate commercial conduct that takes place elsewhere, and its attempt to do so is unconstitutional *per se*. The Act's extraterritorial overreach is glaring because the Act does not impose any burden on *any*

local actor. The Act requires nothing of any local retailer or consumer, and there are no local manufacturers of nonwoven disposable products. Indeed, under the Act, local retailers can continue to promote wipes as flushable and to trade on the popularity of such products for their own local profits while subjecting Kimberly-Clark and other out-of-state manufacturers to liability. The Act thus cannot be reasonably viewed as a regulation of local conduct. Even if so viewed, moreover, the Act is invalid because it inordinately burdens interstate commerce.

B.    The Act violates the First Amendment because it imposes a content-based and speaker-based constraint on commercial speech. It bans one disfavored set of speakers—manufacturers—from using the term "flushable" to describe their products in accordance with their intended function and design, unless the products satisfy the District's definition of the term. Moreover, any covered product that does not meet that amorphous definition is subject to the Act's compelled speech requirement. The manufacturer must describe the product to consumers in its own words as "not flushable," even if the manufacturer has substantial, empirically based grounds for believing—and indeed proving—that the product *is* flushable. The Act cannot satisfy the scrutiny that attaches to governmental regulation of speech because the problem the Act seeks to address, a $50,000 annual fiscal burden, is minor rather than compelling, and because the Act burdens speech far more than necessary to achieve this modest aim.

C.    The Act violates Due Process because it seeks to regulate under impermissibly vague standards, thus depriving Kimberly-Clark of fair notice of the conduct that the District intends to "sanction[]" through "civil fines and penalties." Moreover, to the extent it has any local nexus at all, the Act improperly seeks to punish manufacturers for the *lawful* acts of unrelated commercial actors—the decisions made by District retailers to *lawfully* purchase Kimberly-Clark's flushable wipes and *lawfully* offer them for sale to District consumers.

For all of these reasons, the Court will likely find the Act unconstitutional. In this context, the merits issue largely resolves whether a preliminary injunction should issue. As a matter of law, constitutional violations inflict irreparable harms. Moreover, the constitutional character of Kimberly-Clark's injuries and the District's modest regulatory goal demonstrate that the balance of equities and the public interest would be served by a grant of preliminary relief.

## I.   KIMBERLY-CLARK WILL LIKELY PREVAIL ON THE MERITS.

### A.   The Act Violates The Commerce Clause.

The Commerce Clause grants Congress the exclusive power to "regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. In turn the Commerce Clause imposes "an implicit or 'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce." *Healy v. Beer Instit., Inc.*, 491 U.S. 324, 326 n.1 (1989). This doctrine has "deep roots," *Comptroller of the Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1794 (2015), and "reflect[s] the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres," *Healy*, 491 U.S. at 335-36.

Accordingly, "[w]hen a state statute directly regulates or discriminates against interstate commerce," the Supreme Court has "generally struck down the statute without further inquiry." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986); *see Edgar v. MITE Corp.*, 457 U.S. 624, 640 (1982) (plurality op.) ("The Commerce Clause ... permits only *incidental* regulation of interstate commerce by the States; direct regulation is prohibited"). Even when a statute "regulates even-handedly to effectuate a legitimate local public interest" and does not directly regulate interstate commerce, it is invalid if "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S.

137, 142 (1970). These constraints apply equally to "local legislation of the District." *Milton S. Kronheim & Co. v. District of Columbia*, 91 F.3d 193, 198 (D.C. Cir. 1996).

The Act violates the Commerce Clause in at least two ways. First, it is invalid *per se* because it regulates out-of-state conduct, such as Kimberly-Clark's manufacturing and labeling, while leaving local conduct untouched. *See, e.g.*, *Healy*, 491 U.S. at 336-37. Second, even if viewed as a local regulation, the Act is invalid because it burdens interstate commerce to an extent that far outweighs any conceivable local benefit. *See, e.g.*, *Pike*, 397 U.S. at 142.

1.   **The Act is *per se* invalid because it directly regulates commercial conduct that takes place outside the District's borders.**

A State or District "statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." *Healy*, 491 U.S. at 336. This constitutional rule categorically precludes cross-border regulation of commercial conduct, "whether or not the commerce has effects within the" jurisdiction that is attempting to regulate conduct "wholly outside of [its] borders." *Id.*; *Brown-Forman*, 476 U.S. at 582-83 ("While New York may regulate the sale of liquor within its borders, and may seek low prices for its residents, it may not 'project its legislation into [other States] by regulating the price to be paid' for liquor in those States.") (alteration in original).

In considering whether a law violates dormant Commerce Clause principles by regulating extraterritorially, courts focus on "the practical effect of the regulation." *Healy*, 491 U.S. at 336. They thus "consider[] the consequences of the statute itself, [and] how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Id.* The ultimate question is whether the challenged law effectively would "control conduct beyond the boundaries of the State." *Id.*

Here, the Act has precisely the "practical effect" that Commerce Clause precedents forbid. It controls conduct that occurs outside the District's borders. It is "manufacturer[s]" alone who are subject to the District's mandates. D.C. Law 21-220, § 3; *see also* Committee Report at 4 ("Although the bill as introduced explicitly exempted" non-manufacturing entities such as "wholesalers and retailers from enforcement under the act, the committee print does not name these exempted parties because the Committee clarified in other parts of the bill that it is only intended to apply to manufacturers."). Accordingly, it is only manufacturers who are subject to "civil fines and penalties as sanctions for violations" of the Act, and only manufacturers against whom the District's Attorney General may seek "injunctive relief." D.C. Law 21-220, § 4.

But Kimberly-Clark does not manufacture or label any of its products in the District. *See* Compl. ¶ 37; Matheus Decl. ¶ 5. Nor does Kimberly-Clark maintain its headquarters in the District, or retail or otherwise sell its products directly into the District. Compl. ¶¶ 37-38; Matheus Decl. ¶ 5. Kimberly-Clark sells its products to unaffiliated business entities, including retailers and wholesalers, outside the District. Compl. ¶ 38; Matheus Decl. ¶¶ 11-12. It appears that *every* relevant company conducts its manufacturing and labeling outside of the District. Compl. ¶ 37; Matheus Decl. ¶ 10. In practical effect, the Act has an *exclusively* extraterritorial reach.

This projection of the District's regulatory regime into South Carolina and other states plainly violates the Commerce Clause, as a number of recent cases illustrate. For instance, in *North Dakota v. Heydinger*, the Eighth Circuit held that "[a] state statute has undue extraterritorial reach and 'is per se invalid' when it 'requires people or businesses to conduct their out-of-state commerce in a certain way.'" 825 F.3d 912, 919 (8th Cir. 2016). It accordingly struck down a Minnesota statute that "prohibit[ed] transactions that originate outside Minnesota." *Id.* at 922.

The Ninth Circuit similarly struck down a California statute that purported to regulate sales of fine art carried out in other states if the seller was a California resident. Citing extraterritoriality principles, the Ninth Circuit "easily conclude[d]" that California's regulation "violates the dormant Commerce Clause." *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015). The Seventh Circuit struck down an Indiana law that "directly regulate[d] the production facilities and processes of out-of-state manufacturers and thus wholly out-of-state commercial transactions." *Legato Vapors, LLC v. Cook*, 847 F.3d 825, 837 (7th Cir. 2017). And another judge in this District has applied *Healy* to strike down District legislation. *Pharm. Research & Mfrs. of Am. v. District of Columbia*, 406 F. Supp. 2d 56, 69-71 (D.D.C. 2005) (*PhRMA*), *aff'd on other grounds*, 496 F.3d 1362 (Fed. Cir. 2007). Judge Leon addressed a local ordinance that "ma[d]e it unlawful for any drug manufacturer ... 'to sell or supply for sale or impose minimum resale requirements for patented prescription drugs *that results in* the prescription drug being sold in the District for an excessive price.'" *Id.* at 68. The court found that it "was intended to and [would] control out-of-state conduct" because the pharmaceutical manufacturers were all "out of state" and sold their products out of state. *Id.* at 70. The ordinance (which, like the Act, imposed civil penalties) was invalid because it did not leave the manufacturers "free to conduct commerce on their own terms elsewhere, without either scrutiny or control by the District." *Id.*

The District has again walked this forbidden path. Because the Act governs only *manufacturers*' conduct, and because every aspect of Kimberly-Clark's relevant conduct takes place outside the District, the Act in practical effect regulates extraterritorially. The Act's cross-border reach is highlighted by the fact that Kimberly-Clark could avoid paying civil fines and penalties only by conforming its nationwide labeling practices to District requirements. *See Healy*, 491 U.S. at 336 (reviewing court must "consider[] the consequences of the statute" in its "practical

effect" analysis). Kimberly-Clark manufactures flushable wipes, but does not control the geographic distribution or retail sale of its wipes. Once wipes leave Kimberly-Clark's hands and enter the stream of interstate commerce, Kimberly-Clark does not control where they go. For that reason, any effort to construct a "District-only" line of products would fail. Kimberly-Clark wipes not labeled in accordance with District standards would eventually be swept into the District— inevitably so, because the Act does not regulate the products that may be sold in the District. Under the Act, it is *lawful* for a local retailer to sell an impermissibly labeled product to a local consumer. Kimberly-Clark would suffer the sanction, not the retailer. And so, there would be little reason for District retailers to prefer wipes that have "District-only" packaging. If District retailers think it is in their own interests to obtain and sell flushable wipes that are labeled as flushable, consistent with the actual design and function of the products and the packaging their customers are used to seeing, they will do so.  The Act leaves them free to make that choice.

The problem runs deeper still. Established Commerce Clause principles require a reviewing court to ask "how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Healy*, 491 U.S. at 336. To do so can bring a "Commerce Clause problem" into "even starker relief," *id.* at 339, and certainly does here. Consider what effects would arise, for example, if Baltimore similarly sought to dictate when the terms "flushable" and "not flushable" must be used, but applied standards different from the ones that eventually may emerge from District rulemaking. In this scenario, Kimberly-Clark would be subject to conflicting labeling rules, and would have no way to comply with both. "Baltimore" wipes inevitably would enter the District and "District" wipes would cross into Baltimore, exposing Kimberly-Clark to sanctions in both jurisdictions.

Consider, moreover, a municipality that has considered these issues and not only has concluded that wipes labeled as flushable are, in fact, so, but wants to ensure that consumers can readily distinguish between flushable wipes and baby wipes and other harmful substitutes. In Chicago, for example, wastewater officials have found no problems with flushable wipes in their systems. *See* Compl. ¶ 94 & n.6. Yet, if District law forces manufacturers to stop distinguishing between wipes that are actually flushable and non-flushable wipes, Chicago's policy would be sharply undermined by the District's antipathy toward flushable labeling.

The fundamental failing of the District's approach is that it attempts to impose the entire regulatory burden on entities *outside* the District (where the Council has no constituents and no proper regulatory role), while exempting everyone *inside* the District from the law. The political logic of that approach is clear, but its legal and democratic illegitimacy should be equally apparent. The Council has no authority to "project its legislation into [other States] by regulating" the manufacture and labeling of flushable wipes outside the District. *See Brown-Forman*, 476 U.S. at 582-83. And yet that is precisely what the Act attempts to do.

> **2.      The Act will impose a substantial burden on interstate commerce that far outweighs any conceivable local benefits.**

A law that directly regulates local activity also violates the Commerce Clause if "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. The burdens relevant to the *Pike* analysis "include the disruption of [interstate] travel and shipping due to a lack of uniformity in state laws, impacts on commerce beyond the borders of the defendant [S]tate, and impacts that fall more heavily on out-of-state interests." *V-1 Oil Co. v. Utah State Dep't of Pub. Safety*, 131 F.3d 1415, 1425 (10th Cir. 1997).

Kimberly-Clark does not believe the *Pike* test applies because the Act is not a local regulation; it directly regulates out-of-state manufacturing conduct and expressly *exempts* all

relevant local activities. But if the Act is characterized as a local regulation, it should be struck down under *Pike* because it would substantially burden the interstate flushable wipes market by forcing manufacturers to conform their nationwide conduct to District standards. *See* 21-22, *supra*. Further, if other jurisdictions were to adopt similarly structured labeling laws accompanied by different flushability standards, *see* p.22, *supra*, Kimberly-Clark would lose even the residual ability to manufacture a single product with a single (District-mandated) label for nationwide distribution. In effect, manufacturers would be compelled to splinter a national market into local submarkets, a result squarely at odds with the constitutional design of "a national economic union unfettered by state-imposed limitations on interstate commerce."  *See Healy*, 491 U.S. at 336.

These burdens far outweigh any conceivable local benefit. The District has set out to alleviate a modest local burden: DC Water claims to spend $50,000 per year to address *all* wipe-related clogs. *See* Compl. ¶ 102; Committee Report at 2. Even that figure vastly overstates the issue, given that *flushable* wipes generally make up a small fraction of all wipes found in municipal sewer systems, *see* Compl. ¶¶ 60-61, and, as detailed above, municipal personnel nationwide cannot attribute their sewer problems to wipes labeled as flushable and, in fact, frequently acknowledge when questioned under oath that such wipes *are flushable*. *Supra* p.12 & n.4. Regardless, DC Water is an agency with a $538 million budget, so even if the District's $50,000 estimate were credited, that would mean the agency devotes 0.00000933% of its resources to addressing wipe-related clogs. Compl. ¶ 22 n.1. The Commerce Clause does not allow a city to address confined local concerns by imposing nationwide burdens on an entire industry.

Also relevant is that the Act is far more likely to harm the District's interests than help. The Act's express aim is to prevent manufacturers from helping consumers distinguish, by way of labeling, between products that were designed for safe flushing and those (like baby wipes) that

were not. The Act would do so by requiring manufacturers to label *all* wipes that do not meet the District's amorphous standards as non-flushable, apparently on the theory that consumers will then cease to flush wipes. But that theory is contradicted by the evidence before the Council, which showed that consumers frequently flush products that bear non-flushable labeling, *see* Hearing Record, Attach. C at 2 (testimony of Dave Rousse); *id.* (testimony of Dr. Finley, at 3), and that wastewater associations and municipalities have long recognized the critical importance of giving consumers alternatives to these damaging non-flushable products. *See*, *e.g.*, Joyce Decl., Ex. F (Interview Questions for Technical Workgroup on Flushability) (Robert Villee: "[i]f flushable wipes ... leave the marketplace the consumer will seek out alternatives, namely baby wipes. ... Regulating flushable wipes instead of personal hygiene wipes could actually cause the problems in our sewers to become worse."); Nate Lynch, *Wipes Wreak Havoc on Wastewater Plants*, The Day (May 7, 2016) http://www.theday.com/local/20160507/wipes-wreak-havoc-on-wastewater-plants ("'What we really don't want is a ban on wipes being called flushable,' said Finley, [Director of Regulatory Affairs at NACWA], because research has shown people instead will buy baby wipes—a plastic product that will cause just as much, if not more, damage."). It thus does not follow that if the Act prevents manufacturers from informing District consumers that flushable wipes are flushable, all flushing will stop. More likely, they will continue to flush wipes, and the District's rule will mean they will have less information about which wipes are likely to cause problems when flushed.

That reality further undermines the District's asserted justification. The District has no warrant to burden an entire nationwide industry by regulating products that have no proven link to a problem that, in any event, the District spends no more than $50,000 per year to address. *Pike* demands a far more proportionate policy response than what the District has chosen here.

### B.      The Act Violates The First Amendment.

The First Amendment was "intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us ... in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991). It "reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.'" *Boos v. Barry*, 485 U.S. 312, 318 (1988). That commitment extends to commercial speech, including consumer product packaging. *See, e.g.*, *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995) (striking down restriction on information manufacturers may include on beer labels).

To protect commercial speech, courts apply "heightened scrutiny whenever the government creates a regulation of speech because of disagreement with the message it conveys." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011). In other words, strict scrutiny applies when a legislature has set out to burden particular speakers whose commercial speech messages are deemed to be "in conflict with the goals of the state." *Id.* at 565. A law "designed ... to target those speakers and their messages for disfavored treatment ... 'goes even beyond mere content discrimination, to actual viewpoint discrimination.'" *Id.*

In contrast, when governmental rules constrain the content of commercial speech without targeting "a particular viewpoint," *id.*, government constraints must satisfy "intermediate" rather than "strict" scrutiny, and thus must "directly advance[] a substantial governmental interest and [be] drawn to achieve that interest," *id.* at 572 (citing, *inter alia*, *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980)).

Further considerations apply when a commercial speech regulation takes the form of a compelled disclosure. Speech regulations of this form are upheld only if the regulation requires

disclosure only of "purely factual and uncontroversial information." *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 26 (D.C. Cir. 2014). Flat prohibitions on commercial speech, in contrast, may be upheld only where the affected speech is "*inherently* likely to deceive or where the record indicates that a particular form or method of advertising has in fact been deceptive." *In re R.M.J.*, 455 U.S. 191, 202 (1982) (emphasis added). Where speech can at most be characterized as "potentially misleading," an "absolute prohibition" will not be sustained "if the information also may be presented in a way that is not deceptive," such as through "a requirement of disclaimers or explanation." *Id.* at 203. "[D]isclaimers," in other words, are "constitutionally preferable to outright suppression." *Pearson v. Shalala*, 164 F.3d 650, 657 (D.C. Cir. 1999).

The Act's repressive regulation of commercial speech flunks every one of these tests.

### 1. The Act impermissibly imposes a speaker-based and content-based restraint on commercial speech.

On its face, the Act specifically targets the speech of wipes manufacturers only. *See* D.C. Law 21-220, § 3(a) ("[*A*] *manufacturer* ... shall not label[.]"); *id* § 2(2) ("label" refers only to a representation "*on the packaging* of a nonwoven disposable product) (emphases added). Thus, the Act bars manufacturers from describing products that do not meet the District's standards as "flushable," but wholesalers and retailers operating in the District remain completely free to use the term "flushable" when advertising wipes to customers through any medium—including through stickers placed directly on the packaging.

The Act thus imposes a speaker-based restriction—it targets the speech of selected commercial actors. Moreover, the Act was specifically designed to prevent those targeted actors from conveying a message that the District disfavors. The Council noted that DC Water and other regional water and wastewater utilities were developing a "public outreach campaign" designed to convey the District's view "about what products may be safely flushed," and claimed that "this

campaign's message is compromised when products that do not break down in a typical sewer system are labeled 'flushable.'" Committee Report at 3; *see also id.* at 5 (DOEE director testified that the Act "will support the efforts of the 'Protect Your Pipes' [public advertising] campaign"). These statements betray that the Council adopted the Act for a reason that warrants strict scrutiny: it chose to regulate manufacturers' commercial speech out of "disagreement with the message it conveys." *Sorrell*, 564 U.S. at 566.

To survive strict scrutiny, the District would have to prove that the Act's regulation of speech is both "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Boos*, 485 U.S. at 321; *see also Ibanez v. Fla. Dep't of Bus & Prof'l Regulation*, 512 U.S. 136, 142 n.7 (1994) ("the party seeking to uphold a restriction on commercial speech carries the burden of justifying it"). The Act fails both prongs of this demanding standard.

The Act does not serve any *compelling* government purpose. It does not, for example, advance an interest in "combatting terrorism," *Holder v. Humanitarian Law Project*, 561 U.S. 1, (2010), "maintaining a stable political system," *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 226 (1989), or "ensur[ing] the basic human rights of members of groups that have historically been subjected to discrimination," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992). Rather, the legislative history makes clear that the Council primarily sought to reduce the need for DC Water "to undertake costly repairs and dedicate hundreds of hours in manpower to removing wipes that are stuck in pipes and motors and to repair equipment." Committee Report at 3. As noted, DC Water estimated that these efforts (which it has never demonstrated have any link to *flushable* wipes, as distinct from other waste from products never designed for flushing or marketed as flushable) cost the agency approximately $50,000 each year—a tiny fraction of DC Water's $500 million-plus budget. Compl. ¶ 22 n.1. *De minimis* cost considerations such as these

do not qualify as a compelling governmental interest. *See Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 263 (1974); *United States v. Sec'y, Fla. Dep't of Corr.*, 828 F.3d 1341, 1347 (11th Cir. 2016).[6] The Court may conclude on this ground alone that, under *Sorrell*, the Act violates the First Amendment.

The Act also fails strict scrutiny because it is not narrowly tailored to achieve the District's asserted goal of achieving modest cost savings. A law "is not narrowly tailored" when "a less restrictive alternative" method of pursuing the asserted governmental interest is "readily available." *Boos*, 485 U.S. at 329. Here, the Council decided to impose a speaker- and content-based restriction of speech, backed by monetary penalties, to address the modest, unsubstantiated burden cited by DC Water. The District could have addressed the alleged maintenance burden without regulating speech at all—let alone by taking the extreme approach reflected in the Act.

For one, the District could have relied on its ability to get its own message across to District residents. In fact, together with other local bodies, the District has sponsored an advertising campaign to convey the Council's view that only bodily excretions and toilet paper should be flushed, and that products marketed and labeled as "flushable" should not. *See* Committee Report at 3 & n.11 (citing Metro. Wash. Council of Gov't's Comm. Engagement, *Protect Your Pipes*, https://www.protectyourpipes.org/toilet/); Hearing Record (testimony of George S. Hawkins)

---

[6] The Council also referenced a concern that utility workers face health risks from cleaning wipes out of pumps and other equipment. Committee Report at 3. That maintenance task, however, is an unavoidable aspect of managing wastewater facilities that long predates the marketing of flushable wipes. *See, e.g.*, EPA, *Wastewater Technology Fact Sheet:  Screening and Grit Removal* at 1, 3 ("Wastewater contains large solids and grit that can interfere with treatment processes or cause undue mechanical wear and increased maintenance on wastewater treatment equipment. … Manually cleaned screens require frequent raking to avoid clogging."), https://www3.epa.gov/npdes/pubs/final_sgrit_removal.pdf. The legislative record contains no evidence that flushable wipes add to this burden; the Council was content to "trust[] DC Water's assertion that these products cause problems in DC's sewer system." Committee Report at 8.

(noting that the campaign includes "print materials," "metro and bus advertising," and "movie theater advertising"). Yet the District does not appear to have studied whether this campaign, which unlike the Act comports with "our law and our tradition that more speech, not less, is the governing rule," *Citizens United v. FEC*, 558 U.S. 310, 361 (2010), could have achieved the District's cost-saving goal.[7]

Other alternatives abound. *See* pp. 32-33, *infra*. The District chose none of them, and appears to have studied none—just as there is no indication that DC Water has ever conducted a collection study to determine whether *flushable* wipes are actually failing to disperse in its system. *See* Committee Report at 8 (councilmember noting the absence of "data to support" DC Water's "assertion" that "flushable wipes are actually the cause of clogs in the DC sewer system"). Nor is there any evidence that the District conducted any study of whether the portion of the $50,000 cost burden attributable to flushable wipes (if any) could be addressed through non-speech regulations, or through a less restrictive regulation of speech. That evidentiary gap dooms the Act, because the District bears the burden of proving that it chose the least speech-restrictive approach available to it. *See Boos*, 485 U.S. at 329.

> ## 2. The Act impermissibly prohibits manufacturers from engaging in protected commercial speech while compelling them to instead parrot the District's view on a contested issue of public concern.

The First Amendment protects commercial speech, "that is, expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson*, 447 U.S. at 561. "The commercial marketplace, like other spheres of our social and cultural life, provides a forum where

---

[7] Indeed, after conducting collection studies in concert with municipal and wastewater personnel elsewhere, the industry partnered with Portland, Maine on an award-winning Don't Flush Baby Wipes campaign. Powling Decl. ¶ 32; *see also INDA-MEWEA "Don't Flush Baby Wipes" Pilot Public Education Campaign* (Apr. 2015), http://www.responsibleflushingalliance.com/inda_mewea_don_t_flush_baby_wipes_pilot_public_education_campaign; *Save Your Pipes: Don't Flush Baby Wipes* (Mar. 30, 2016), http://news.wef.org/save-your-pipes-dont-flush-baby-wipes/.

ideas and information flourish." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993). Thus, the Supreme Court has "rejected the 'highly paternalistic' view that government has complete power to suppress or regulate commercial speech," *Cent. Hudson*, 447 U.S. at 562. "[T]he general rule is that the speaker and the audience, not the government, assess the value of the information presented." *Edenfield*, 507 U.S. at 767.

As noted, courts typically apply "intermediate" rather than "strict" scrutiny when examining commercial speech constraints that regulate advertising content without attacking targeted speakers or viewpoints, *cf. Sorrell, supra.* To survive "intermediate scrutiny," a speech constraint must "directly and materially advance[] a substantial state interest in a manner no more extensive than necessary to serve that interest." *Ibanez*, 512 U.S. at 142.

The Act restricts commercial speech in two ways. First, it prohibits a manufacturer from labeling its nonwoven products as flushable—even if it has a reasonable and scientifically grounded basis for doing so—unless the products satisfy the District's amorphous "standards" (as interpreted in regulations that DOEE and DC Water may eventually promulgate). *See* D.C. Law 21-220, § 3(a). Second, wipes that do not do not meet these "standards" must be "clearly and conspicuously label[ed]" as products that "should not be flushed." *Id.* § 3(b). Together, these restrictions *prevent* manufacturers from informing the public of their view that their products can safely be flushed and *require* manufacturers to use their own platform—product packaging—to advance a governmental message that they do not believe.

Regardless of whether the District's interest in reducing a share of an estimated $50,000 annual maintenance burden qualifies as a "substantial" interest, *cf. Am. Meat Instit.*, 760 F.3d at 23, the Act clearly fails the other two aspects of the *Central Hudson* standard. It does not "directly" advance the District's stated interest in reducing maintenance costs because there is no evidence

that the Act "will in fact alleviate [the cost burden] to a material degree." *Edenfield*, 507 U.S. at 770-71. Moreover, the District's approach of banning private speech and compelling manufacturers to recite the government's view is much "more extensive than is necessary to serve that interest," *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249 (2010)—a conclusion that nearly always follows where, as here, "government chooses a policy of suppression over disclosure." *Pearson*, 164 F.3d at 658.

> **a.   There is no evidence that the Act would "directly and materially advance" the District's asserted interest.**

If the District believes that DC Water's operations are adversely affected when residents flush flushable wipes, the most direct way to address that concern would be through municipal actions that directly modify the flushing habits of local residents, not commercial speech regulations that aim indirectly at that goal by penalizing manufacturers for describing products using established industry terminology that the District does not like. The District could (1) advise consumers, in its own voice, of DC Water's view that flushable wipes should not be flushed, (2) raise rates on District residents for flushing products that should not be in the system, or (3) impose taxes on specific products that are determined to be causing such harm.

Any of these approaches would, for one, actually fall within the Council's authority to regulate local activity (*see* § I.A.1, *supra*) and would more likely address the asserted cost burden. Because the District instead chose the constitutionally disfavored approach of controlling speech, the Act can survive only if the District carries the burden of proving "that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 771; *see also Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 510, 524 (D.C. Cir. 2015) (government must show "the effectiveness of the measure in achieving" its goal). The Act fails on both counts.

There is *no evidence* that flushable wipes (as opposed to baby wipes and other products that were never designed for flushing or marketed as such) are *actually* responsible for any part of the $50,000 maintenance burden claimed by the District. Councilmember McDuffie raised precisely this concern when the Act was before the Council, asking "whether DC Water has data to support" the "assertion" that "flushable wipes are actually the cause of clogs in the DC sewer system." Committee Report at 8. Evidently, no data was forthcoming; the minutes merely recite Councilmember Allen's announcement that he "trusts DC Water's assertion that these products cause problems in DC's sewer system." *Id.*; *but see*, *e.g.*, *supra* p. 12 & n.4 (admissions by other municipal personnel that they cannot visually distinguish between flushable and non-flushable wipes). As a constitutional matter, however, speech constraints backed only by "unsupported assertions" cannot survive intermediate scrutiny. *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 648 (1985).

There is also *no evidence* that the Act, which leaves both flushable and non-flushable wipes on District retail shelves and bans manufacturers from informing consumers that only some are flushable, will do anything to reduce clogs in the District's wastewater systems—let alone "alleviate them to a material degree." *Edenfield*, 507 U.S. at 771 (emphasis added). The legislative record does contain an assertion that by suppressing manufacturer speech, the Council would prevent the message of the "Protect Your Pipes" public advertising campaign from being "compromise[d]." Committee Report at 3. But governments may not use viewpoint suppression to achieve legislative aims. *See Sorrell*, 564 U.S. at 565; *cf. Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017) (claimed governmental interest in "preventing speech expressing ideas that offend" rejected because "that idea strikes at the heart of the First Amendment"). Moreover, even that improper mechanism went unexamined; the Council's deliberations reveal nothing but "speculation or

conjecture," *Nat'l Ass'n of Mfrs.*, 800 F.3d at 526, about how the legislative means—barring manufacturers from labeling products as flushable in accordance with industry standards—would materially advance the asserted end of "alleviat[ing]" local clogging, *Edenfield*, 507 U.S. at 770-71. The Act therefore cannot withstand intermediate scrutiny review.

### b.  The Act is unconstitutional because it is not "narrowly drawn."

If the District somehow proved that the Act would *actually* ameliorate DC Water's purported cost burden, it next would have to show that this benefit does not come at an "inordinate cost," *Bd. of Trustees of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989), and thus would have to show that the Council did not "disregard[] far less restrictive and more precise means" of achieving the same end. *Pearson*, 164 F.3d at 658 (quoting *Fox*, 492 U.S. at 479).

The answer here is that the District clearly bypassed less restrictive regulations when it commanded that manufacturers "shall not label" products flushable unless District-only speech standards are met, and must contradict their own beliefs by telling consumers "clearly and conspicuously" that flushable products in fact "should not be flushed." D.C. Law 21-220, § 3.

There is nothing novel about that conclusion. The Supreme Court's commercial speech cases repeatedly have declared that "[t]he State cannot ... completely suppress information when narrower restrictions on expression would serve its interest as well." *Cent. Hudson*, 447 U.S. at 565; *see also Bates v. State Bar of Ariz.*, 433 U.S. 350, 375 (1977) (invalidating total ban on attorney advertising, stating that "the preferred remedy is more disclosure rather than less"); *In re R.M.J.*, 455 U.S. at 203 ("States may not place an absolute prohibition on ... potentially misleading information ... if the information also may be presented in a way that is not deceptive"; advertising restrictions "may be no broader than reasonably necessary to prevent the deception"). That is, "when government chooses a policy of suppression over disclosure—at least where there is no

showing that disclosure would not suffice to cure misleadingness—government disregards a 'far less restrictive' means," and therefore fails intermediate scrutiny. *Pearson*, 164 F.3d at 658.

This conclusion is completely consistent with the everyday reality that labeling laws frequently require advertisement and marketing materials to be accompanied by supplemental disclosures. *See Am. Meat Inst.*, 760 F.3d at 32 (Kavanaugh, J., concurring) (noting "common and familiar" examples such as "nutrition labels and health warnings," which pass muster under *Central Hudson*). In at least two senses, the Act goes far beyond such common and anodyne requirements, and can be easily distinguished from them.

First, the Act does not merely require sellers or manufacturers to *supplement* flushability claims. It *bans* such claims (unless the product satisfies the Act's amorphous definition, as interpreted, in the future, by DOEE/DC Water rulemaking). The D.C. Circuit has said it is "*obvious*" that supplemental disclosure cases "cannot justify a disclosure so burdensome that it essentially operates as a restriction on constitutionally protected speech." *Am. Meat Inst.*, 760 F.3d at 27 (emphasis added). And yet the Act does precisely that—it commands that manufacturers "shall not label" their products with the forbidden term "flushable" absent government approval.

Second, controlling case law imposes hard and fast limitations on the government's power to impose even less restrictive supplemental disclosure rules—those that require commercial speakers to augment rather than stifle their chosen message. Such rules are valid only if they "require[] the disclosure to be of *purely factual and uncontroversial information* about the good or service being offered." *Nat'l Ass'n of Mfrs.*, 800 F.3d at 527 (emphasis added). In contrast, a compelled disclosure rule that "promotes policies or views that are one-sided or are 'biased against or are expressly contrary to the corporation's views'" violates the First Amendment. *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, --- F.3d ---, 2017 WL 4126944, at *6 (9th Cir. Sept. 19,

2017) (quoting *Pac Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 15 n.12 (1986) (plurality op.)). Likewise, a compelled disclosure that "requires speakers 'to use their own property to convey an antagonistic ideological message' ... or to be publicly identified with or associated with another's message,' cannot withstand First Amendment scrutiny." *Id.* (quoting *Glickman v. Wileman Bros. & Elliott*, 521 U.S. 457, 471 (1997)).

The message that the Act requires manufacturers to express is neither "purely factual" nor "uncontroversial." *Nat'l Ass'n of Mfrs.*, 800 F.3d at 527. Indeed, it is quite literally "one-sided." *See Am. Beverage*, --- F.3d ---, 2017 WL 4126944, at *6. The Act's flat declaration that any wipe that does not meet the District's standards is "not flushable" leaves out a host of inconvenient facts. Many wipes labeled flushable—including Kimberly-Clark's—have been specifically engineered to breakdown in water and be safe in home plumbing, septic systems, and municipal sewers. *See* pp.3-4, *supra*. They satisfy widely accepted industry-standard testing, which was developed in conjunction with wastewater groups. *See* pp.5-7, *supra*. They have performed accordingly in municipal wastewater systems as judged by municipal wastewater authorities. *See* pp.8-11, *supra* (in a study conducted independently by New York City authorities, wipes labeled as flushable constituted only 1.2% to 1.88% of items collected, and no Kimberly-Clark flushable wipes were found). And the FTC has indicated that Kimberly-Clark's flushable wipes' labeling is not misleading under federal standards. *See* pp.7-8, *supra* (noting that the Commission has closed its investigation of Kimberly-Clark while obtaining the removal of another manufacturer's former products from the market). For all of these reasons, Kimberly-Clark strongly believes that its flushable products are indeed flushable, and are properly marketed and labeled in those terms. It has a First Amendment right to say so. If the District believes otherwise, it is entitled to speak up too. That kind of contest of views is exactly what the First Amendment envisions.  In contrast, the

First Amendment forbids the District from using monetary penalties to silence Kimberly-Clark's desired message ("these products can be flushed") and force Kimberly-Clark to instead preach the District's contrary word ("these products 'should not be flushed'").

That the District is devising its own definition of "flushable" does not change the analysis. The D.C. Circuit addressed just this point in *National Association of Manufacturers*, where it examined and invalidated an SEC rule that required companies to declare whether minerals used in their products were "conflict free." In words that effectively anticipated this case, it held:

> We agree with [plaintiff] that the statutory definition of "conflict free" cannot save this law. As [plaintiff] forcefully puts it, "[i]f the law were otherwise, there would be no end to the government's ability to skew public debate by forcing companies to use the government's preferred language. *For instance, companies could be compelled to state that their products are not 'environmentally sustainable' or 'fair trade' if the government provided 'factual' definitions of those slogans—even if the companies vehemently disagreed that their [products] were 'unsustainable' or 'unfair.'*"

*Nat'l Ass'n of Mfrs.*, 800 F.3d at 529-30 (emphasis added).

So too here. Kimberly-Clark strongly believes that its flushable products are in fact flushable, vehemently disagrees with the District's contention that its products are "not flushable," and denies that the District has authority to compel Kimberly-Clark to parrot the District's viewpoint and "preferred language," *see id.*, as the Act would require.

### C.     The Act Violates The Fifth Amendment.

The Fifth Amendment guarantees that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend V. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined," *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972), and "when a statute interferes with the right of free speech or of association, a more stringent vagueness test should apply," *Holder*, 561 U.S. at 19. Likewise, when exacting civil punishments, the government may not "[i]mpos[e] liability without

independent fault" unless it "rationally advances [a] State's goal" and "is not fundamentally unfair." *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 14 (1991). The Act violates each principle.

### 1.     The Act Is Void For Vagueness.

Legislation does not pass constitutional muster where it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages serious discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). In the First Amendment context, a statute is void if "it is unclear whether it regulates a substantial amount of protected speech." *Id.* The Act fails this test; it relies on the ambiguous word "flushable" to determine a manufacturer's labeling obligations, and thus its exposure to penalties.

The word "flushable" has a range of possible meanings. *See* pp.5-11, *supra*. Nonetheless, whether a manufacturer is liable for mislabeling its wipes turns on this ambiguous word: "a manufacturer ... shall not label [a] nonwoven disposable product as safe to flush, safe for sewer systems, or safe for septic systems, unless the nonwoven disposable product is *flushable*." D.C. Law 21-220, § 3(a) (emphasis added); *see also id.* § 3(b). These provisions fail to clearly define the conduct forbidden by law, especially because the definition differs from those the nonwoven industry, consumers, wastewater experts, and the FTC have used. *See* pp.5-11, *supra*; *In re Nice-Pak Prods., Inc.*, 2015 WL 7009345 (F.T.C. Oct. 30, 2015).

The Act's definition of "flushable" does not remove this ambiguity. Section 2(1) defines "flushable" to mean "a nonwoven disposable product that (A) [d]isperses in a short period of time after flushing in the low-force conditions of a sewer system; (B) [i]s not buoyant; and (C) [d]oes not contain plastic or any other material that does not readily degrade in a range of natural environments." This definition, however, is itself laden with ambiguous terms such as "short period of time," "buoyant," "any other material," "readily degrade," and "a range of natural environments." Each of these generic terms requires authoritative interpretation and definition—

none of which the Act provides—and as a result, no manufacturer can determine the circumstances in which the Act forbids it from labeling a product as "flushable."

To be sure, Section 5 of the Act directs DOEE to "issue rules to implement the provisions of this act … in consultation with" DC Water, but that does not save the Act. To date, DOEE has not even given notice of the regulations it intends to promulgate, let alone issued those rules. And yet the Act will become enforceable, with or without clarifying regulations, on January 1, 2018. D.C. Law 21-220, § 3. To allow the Act to be enforced and civil penalties to be exacted under these conditions would violate the rule that agencies must provide "fair warning of the conduct [a regulation] prohibits or requires." *Gates & Fox Co. v. Occupational Safety & Health Review Comm'n*, 790 F.2d 154, 156 (D.C. Cir. 1986) (Scalia, J.). The District's enforcement of the Act should be restrained to protect Kimberly-Clark from unconstitutional penalties.

### 2.    The Act Impermissibly Punishes Manufacturers For Their Lawful Conduct In Other States.

The Act would violate Due Process even if it sufficiently specified the conduct it seeks to proscribe and punish. As in other applications of Due Process, the key question where civil penalties are concerned is whether the government's exaction comports with notions of "fundamental fairness." *See Haslip*, 499 U.S. at 14. Here, any penalty imposed on Kimberly-Clark would be fundamentally unfair in two senses.

First, it would punish Kimberly-Clark for pursuing a course of conduct in South Carolina (labeling wipes as flushable) that is entirely lawful in South Carolina, and for that reason is entirely beyond the authority of the District to control. *See supra* pp.19-23; *see also Huntington v. Attrill*, 146 U.S. 657, 669 (1892) ("[l]aws have no force of themselves beyond the jurisdiction of the State which enacts them"); *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) (plurality op.) ("each State has a sovereignty that is not subject to unlawful intrusion by other States").

Second, the Act is fundamentally unfair because the local conduct that completes the violation (selling packages of wipes inside the District) is *also* lawful. This feature of the law makes the District's penalty scheme doubly unfair and irrational. The Act supposedly aims to prevent harms caused when District residents flush harm-causing objects, but it imposes penalties *exclusively* on the non-local entities that are the furthest removed from the ultimate local flushing decision. The Act does not regulate local or online retailers who sell flushable wipes to District residents. It does not regulate District residents who decide which products to buy for their own households and how they will dispose of them. The Act's only intervention is to penalize manufacturers for engaging in protected speech that is *lawful* where it takes place, attaching those sanctions when that commercial expression is *lawfully* carried into the District by unaffiliated distributors or retailers. In the District's view, those two rights somehow make a punishable wrong. To the best of Kimberly-Clark's knowledge, no other U.S. governmental entity has ever sought to rest civil punishment on such a bizarre theory of liability.

To be sure, a company may bear a distinguishable form of vicarious civil liability—punishment based on the unlawful conduct of a company's own employees. *See Haslip*, 499 U.S. at 15. But that rule rests on a factor that is absent here—a "principal/agency relationship" characterized by "not only control (or the right to direct or control) but also the manifestation of consent by one person to another that the other shall act on his behalf, and consent by the other so to act." *Meyer v. Holley*, 537 U.S. 280, 286 (2003). That control requirement was key to the Supreme Court's conclusion that punishing the *company* for the *employee's* intentional tort was rational, and therefore consistent with due process, even though the company did not commit the wrong. *See Haslip*, 499 U.S. at 14 ("[i]mposing exemplary damages on the corporation when its agent commits intentional fraud creates a strong incentive for vigilance").

No such tie justifies the imposition of vicarious liability here. As explained, Kimberly-Clark does not control the distribution of the products that it manufactures. It sells those products—including flushable wipes—to unaffiliated distributors and retailers. Those independent companies may in turn sell Kimberly-Clark's products to still other companies that Kimberly-Clark does not own or control. These unaffiliated companies—including national retailers like Walgreen's, Big Lots, Amazon, and Target—are the ones that decide whether to sell Kimberly-Clark's flushable products in the District. They make their own calls to serve their own business aims. No rational purpose would be served by penalizing Kimberly-Clark for these retailers' independent decisions.

There is a second distinguishing factor. The penalty imposed on the company in *Haslip* rested on the obviously *unlawful* conduct of its employee in devising and implementing a fraudulent scheme. Here, in contrast, retailers whose conduct would trigger penalties for Kimberly-Clark would be acting *lawfully*. As the Committee Report explains (at 4), the retailers are "exempted parties," whom the Council purposefully left free to sell flushable wipes as they wish, regardless of whether those products are labeled in conformance with District standards.

*Haslip* therefore cannot justify the Act's aberrant penalty scheme. *Haslip* approved vicarious liability for corporations that fail to prevent unlawful frauds committed by employees who are subject to their supervision and control. The Act, in contrast, seeks to hold Kimberly-Clark vicariously liable for the lawful local conduct of retailers whom Kimberly-Clark does not control. This unprecedented and utterly irrational penalty scheme violates Due Process.

## II.    A PRELIMINARY INJUNCTION IS NECESSARY TO PROTECT KIMBERLY-CLARK AGAINST IRREPARABLE HARM.

Where a plaintiff establishes a likelihood of success on the merits of a constitutional claim, the irreparable harm prong of the preliminary injunction standard is readily established. "[S]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not

ordinarily require proof of any injury other than the threatened constitutional deprivation itself," because "a prospective violation of a constitutional right constitutes irreparable injury for these purposes." *Gordon*, 721 F.3d at 653; *see also Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (same as to First Amendment injuries). These cases control here. Kimberly-Clark is suing to enjoin the Act and preserve its rights under the Commerce Clause, First Amendment, and Fifth Amendment. Absent injunctive relief, those constitutional rights will be infringed and Kimberly-Clark will suffer irreparable harm.

## III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST CONSIDERATIONS WEIGH STRONGLY IN FAVOR OF PRELIMINARY RELIEF.

In deciding whether to grant a preliminary injunction, a court must also consider whether "the balance of the equities tips in [the plaintiff's] favor," and whether "an injunction is in the public interest." *Winter*, 555 U.S. at 20; *see Aamer*, 742 F.3d at 1038. Here, these two factors may be considered as one, for they "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009) (addressing four-part stay factors and noting the "substantial overlap" between stay and preliminary injunction standards); *Pursuing America's Greatness*, 831 F.3d at 511 (applying *Nken* approach to preliminary injunctions).

Both factors strongly favor the grant of injunctive relief, again because this is a case in which Kimberly-Clark is asserting constitutional claims. The D.C. Circuit has held it "obvious" that "enforcement of an unconstitutional law is always contrary to the public interest," *Gordon*, 721 F.3d at 653, and has applied that rule specifically to the First and Fifth Amendments, *see id.* ("The Constitution does not permit Congress to prioritize any policy goal over the Due Process

Clause"); *Pursuing America's Greatness*, 831 F.3d at 511 ("there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation").

Non-constitutional considerations provide further support for Kimberly-Clark's request for preliminary relief. The balance of the equities tips strongly in favor of preliminary relief because an injunction would protect Kimberly-Clark from extensive harms while costing the District almost nothing. *See Pursing America's Greatness*, 831 F.3d at 511 ("The balance of the equities weighs the harm to [the plaintiff] if there is no injunction against the harm to the [government] if there is."). If the Act goes into effect, Kimberly-Clark will have only two available options. It will have to change *all* its labeling on flushable wipes sold nationwide to conform to the Act, or it will change *none* and risk incurring significant civil penalties under the Act when independent companies acquire Kimberly-Clark's products and ship them to the District for sale.[8]

Either option would be enormously harmful. As explained in the Ms. Matheus's declaration, the process of revising product labeling would be costly, and would take months to implement.[9] Matheus Decl. ¶¶ 13-16.  Moreover, if Kimberly-Clark were to change its product labels and denounce its own products as "non flushable" when they have long been sold as "flushable," that about-face could seriously harm the company's reputation with its brand-loyal consumers across the country, who (quite justifiably) will not understand that Kimberly-Clark is merely responding to a District ordinance and has not actually changed its own well-substantiated

---

[8] As explained above, p.5, Kimberly-Clark does not conduct or control the distribution or retail sale of its products, and the Act does not place any restriction on the retailers or consumers who sell and buy flushable wipes in local stores. Kimberly-Clark therefore does not have the option to design two sets of wipes—one for use in the District, and another for the rest of the country.

[9] Indeed, even a labeling change would not protect Kimberly-Clark from the risk of enforcement given that many Kimberly-Clark flushable products featuring current labeling already have been sold to retailers and wholesalers and may remain in circulation long after January 1, 2018. Matheus Decl. ¶¶ 15-16.

view that its flushable wipes are, in fact, flushable despite media reports to the contrary. *See* Langelin Decl. ¶¶ 19-24; *see generally* 6 Callmann on Unfair Comp., Tr. & Mono. § 23:47 (4th Ed.) ("In a competitive industry where consumers are brand-loyal, loss of market share is a harm that cannot be redressed by a legal remedy, nor by an equitable one following trial.").

If Kimberly-Clark chose instead to leave its labels unchanged during the litigation, its liability exposure would be significant. The Act authorizes the Mayor to impose "civil fines and penalties as sanctions," pursuant to the terms of District's Consumer and Regulatory Affairs Civil Infractions Act of 1985. D.C. Law 21-220, § 4(a). A single offense could be punishable up to $16,000. 57 DCR 181, 210 (Jan. 8, 2010). It is not clear at this time how the District will seek to define and enforce violations of the Act (including whether each package sold constitutes a violation), but given the popularity of Kimberly-Clark's flushable wipes with consumers and retailers, the District's penalty claims could prove significant.[10] Either way, Kimberly-Clark will incur substantial harms if the Act takes effect—losses that in all likelihood would not be recoverable post-litigation because the District generally enjoys sovereign immunity against suit. *See generally Watters v. Wash. Metro. Area Transit Auth.*, 295 F.3d 36, 39 (D.C. Cir. 2002).

A preliminary injunction, on the other hand, will have almost no practical effect on the District. As explained, the District's own estimate is that the Act takes aim at a $50,000 problem supposedly caused by wipes in general; there is no evidence that *flushable* wipes contribute to clogging; all reputable evidence shows that *flushable* wipes represent, at most, a small fraction of the wipes found in municipal water systems; and the District's speech ban is far more likely to

---

[10] Any demand for excessive penalties might independently violate the Due Process Clause, Excessive Fines Clause, or other constitutional or legal limitations on the District's power to punish. *See, e.g., Austin v. United States*, 509 U.S. 602 (1993). Kimberly-Clark reserves all rights to challenge future applications of the Act if it is permitted to take effect.

make any clogging problem worse. For all of these reasons, in even the rosiest of scenarios, the Act could never achieve anything more than a modest reduction in DC Water's $50,000 problem.

Stack it all up, and the balance is clear. Both the equities and the public interest strongly favor the grant of a preliminary injunction that will bar the District from implementing or enforcing this unconstitutional Act.

## **CONCLUSION**

For the foregoing reasons, the Court should grant a preliminary injunction enjoining defendants from implementing or enforcing the Act pending the entry of final judgment on Kimberly-Clark's constitutional claims.


Dated: October 9, 2017                              Respectfully Submitted,


                                                    /s/ Eamon P. Joyce
                                                    Eamon P. Joyce (Bar No. 483127)
                                                    SIDLEY AUSTIN LLP
                                                    787 Seventh Avenue
                                                    New York, NY 10019
                                                    Telephone: 212-839-5300
                                                    Facsimile: 212-839-5599
                                                    ejoyce@sidley.com

                                                    Kwaku A. Akowuah (Bar No. 992575)
                                                    Christopher A. Eiswerth (Bar No. 1029490)*
                                                    SIDLEY AUSTIN LLP
                                                    1501 K Street, N.W.
                                                    Washington, D.C. 20005
                                                    Telephone: 202-736-8000
                                                    Facsimile: 202-736-8711
                                                    kakowuah@sidley.com
                                                    ceiswerth@sidley.com

                                                    *Counsel for Plaintiff*

                                                    *Petition for Admission Pending

## CERTIFICATE OF SERVICE

I certify that on October 9, 2017, I caused the foregoing document to be filed with the Court through the CM/ECF system, which provides electronic service of the filing to all counsel of record who have registered for ECF notification in this matter.

/s/ Eamon P. Joyce

Counsel for Kimberly-Clark Corporation